UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
EQUAL EMPLOYMENT OPPORTUNITY          :
COMMISSION,

                                      :
                  Plaintiff,

                                      :      REPORT & RECOMMENDATION
CHARLES BROWN,

                                      :      71 Civ. 2877 (LAK) (MHD)
                  Plaintiff-
                  Intervenor          :

       -against-                      :

INTERNATIONAL ASSOCIATION OF          :
BRIDGE STRUCTURAL AND
ORNAMENTAL IRONWORKERS LOCAL 580,     :

                  Defendant.          :
------------------------------------x

TO THE HONORABLE LEWIS A. KAPLAN, U.S.D.J.:


       This motion for contempt is an outgrowth of a race
discrimination lawsuit brought by the United States of America, for
which the Equal Employment Opportunity Commission ("EEOC") later
substituted, against Local 580 of the International Association of
Bridge, Structural ad Ornamental Ironworkers and related
organizations, alleging racial discrimination by the union against
its African-American and Hispanic members. The court issued a
consent decree in 1978 that permanently enjoined the union from
discriminating on the basis of race and national origin, and it has
since found in a series of decisions that the union was in contempt

of this decree through August 31, 1997.

The court initially awarded back pay to injured union members through 1991. In 1998, four plaintiff-intervenors filed a motion for contempt alleging ongoing violations of court orders, and experts for the EEOC and the union, as well as the court, agreed that the union had been in contempt between January 1992 and August 1997 ("the contempt period") but not between August 1997 and August 2004. All claimants except for the last remaining plaintiff-intervenor, Charles Brown, agreed to a settlement which provided back pay for discrimination, in violation of the consent order, that had occurred between January 1992 and August 1997.

Mr. Brown has refused to accept the formula for damages agreed upon by the EEOC and the union, as well as by his former counsel, and has moved for contempt against the union for discrimination that assertedly occurred during the contempt period. In this application he requests a contempt award of $6,339,695.82. Local 580 is willing to pay him $42,149.88, a figure representing his losses between 1992 and August 1997, as calculated by the EEOC's expert, but the union otherwise opposes this motion on the basis that Mr. Brown can offer no evidence of discrimination in contempt of the consent decree after August 1997 and that all parties agreed

2

to be bound by the findings and conclusions of the EEOC's and union's experts.

For the following reasons, we recommend that the district court award Mr. Brown $42,149.88, as calculated by the EEOC's expert, Dr. Farrell Bloch, and that it otherwise deny the contempt motion.

## BACKGROUND

A.  History of EEOC v. Local 580 through 1991 Consent Decree

The United States brought this suit on June 29, 1971, alleging racial discrimination in recruitment, selection, training, membership admissions, job referrals, and compensation by Local 580 and affiliated organizations against African-American and Hispanic union members and potential members. (Def.'s App. of Exs. to Mem. of Law in Opp'n to Pl.-Intervenor's Mot. for Contempt and Back Pay Claim, Ex. A ("1978 Consent J."), 1-2, Feb. 11, 2010). In 1978 the court signed a consent decree permanently enjoining the union from discriminating on the basis of race, color, religion, sex, or national origin and requiring the parties to create an affirmative action plan to eliminate discriminatory practices and effects in

3

recruitment, training, admission to the union, and procedures designed to provide employment opportunities to members. (Id. at 8).

For the purposes of this Report and Recommendation, the relevant portions of the consent decree pertain to record-keeping and referrals of union members to employers. The union agreed to track members' appearances in the referral hall, where contractors relay requests for various types of ironworkers. (Id. at 32-33). The two principal ways that union members found work were a sign-up list in the referral hall and requests by contractors for particular individuals. (Id.). Under the decree, the union was required to respond to each request by referring the qualified member who, according to the sign-in list, had waited the most days in the referral hall without finding a job. (Id. at 34). The sign-in lists were to be made available to the EEOC upon request. (Id. at 36). Finally, the court retained continuing jurisdiction to ensure compliance with the decree. (Id. at 38).

In 1987, the court found Local 580 to be in contempt of the 1978 consent decree based on its failure to comply with several requirements of the affirmative action plan, including record-keeping and race-neutral procedures for securing employment for

4

minority union members. See EEOC v. Local 580, 669 F. Supp. 606, 624-25 (S.D.N.Y. 1987). As a result of its finding, the court permanently enjoined racial discrimination, noncompliance with the record-keeping requirements and retaliation toward any participant in the litigation or anyone who provided such information, and it appointed a Special Master to oversee defendant's compliance with the court's directives. The court also commenced back-pay hearings to provide relief to union members who could prove that they had been harmed by the union's illegal discrimination. Id.; see also Def.'s App. of Exs., Ex. C ("1989 Journeyman Order") at 6, 16. In addition, the court modified the prior preference for hiring the qualified member who had spent the most days in the referral hall, and directed instead that the union choose the qualified member who had worked the fewest hours to date. Local 580, 669 F. Supp. at 622.

In 1991, the parties agreed to a settlement which provided backpay for minority union members, in exchange for which they agreed not to sue defendant on any charge of discrimination through the date of the settlement. (Def.'s App. of Exs., Ex. D ("1991 Back Pay Stipulation"), at 6-7). Among the claimants who received payments as part of the settlement was the current plaintiff-intervenor, Charles Brown, who received $43,000.00. (Def.'s App. of

Exs., Ex. E ("Pl.'s 1991 Release")).

B.   <u>Procedural History from 1998 Contempt Motion</u>

Mr. Brown and three other claimants, all of whom were represented at the time by Ramon J. Jiminez, Esq., moved in 1998 to intervene in the EEOC lawsuit in order to seek an order of civil contempt against the union for violation of the court's orders enjoining discrimination and requiring certain affirmative steps to remedy past discrimination. (Pls.' Mem. of Law in Supp. of Mot. for Contempt, 5, Sept. 25, 1998 ("Pls.' 1998 Mem.")). They alleged that the union had failed to develop a computerized record-keeping system that would enable the EEOC to monitor employment of minority union members and that the union had continued to use discriminatory practices to funnel job opportunities to white members. (<u>Id.</u> at 10). The claimants requested further back-pay proceedings to restore lost wages and benefits. The union responded by arguing that the motion should be denied based on procedural faults, including plaintiff's failure to cite specific provisions of allegedly violated court orders, to provide sufficiently specific factual allegations of incidents of discrimination and to submit a memorandum of law. (Def.'s Mem. Of Law in Opp'n to Pl.-Intervenor's Mot. for Contempt/In Support of Def.'s Cross-Mot. to

Dismiss ("Def.'s 2009 Resp."), 4-5 June 12, 2009). The court denied the union's application and allowed claimants to proceed as intervenors. (Def.'s App. of Exs., Ex. F ("2001 Opinion")). The Second Circuit subsequently dismissed the union's appeal for lack of appellate jurisdiction. See EEOC v. Local 638, 34 Fed. Appx. 6, 7 (2d Cir. 2002). This ruling then left for litigation the contempt allegation  pertaining to the period beginning in 1992.

In 2003, the parties, including counsel for the plaintiff-intervenors (at this time Scott Korenbaum, Esq.), agreed to adopt the liability and damages findings of the EEOC's and union's experts, who had both arrived at substantially similar numbers in calculating the disparity between hours worked by minority and non-minority union members and in measuring the individuals claimants' damages. (See Def.'s App. of Exs., Ex. I ("2003 Expert Report Stipulation"), at 4). The experts both concluded that the disparity between the number of hours worked by white and by minority union members was statistically significant -- thus implying a bias in job referrals -- from 1992 through 1996 but that it was not significant starting in August 1997. (Id. at Ex. A, 1-2 & Ex. B, 2). The experts then separately calculated the amount of damages for each claimant based on the noted disparities, and for Charles Brown they reached almost identical results, with the union's

7

expert calculating his damages to be $42,123.39 (Id. at Ex. C, App. A, 12), whereas the EEOC's expert calculated his damages to be $42,149.88. (Id. at Ex. D, 25). This analysis took into account the journey-person's wage rate and contributions for vacation, pension, and annuity benefits. (Id. at 2). In 2007, the court issued another consent judgment, adopting the experts' findings concerning the union's compliance with court orders during the period in question and approving the settlement agreements ultimately reached between the union and all claimants except Mr. Brown. (Def.'s App. of Exs., Ex. J ("2007 Consent Order")). As for Mr. Brown, who was now appearing pro se, he rejected the agreed-upon measurement of damages and seemed to be asserting that he was entitled to recover additional claimed loss for a lengthy period preceding 1992 notwithstanding that he had been previously compensated for the earlier period, in exchange for which he had released the union from further claims from that period.

With Mr. Brown the lone holdout, the court in 2007 referred his claims to me after the Special Master had recused himself from these proceedings. (2007 Consent Order, 10). These remaining proceedings following a somewhat tortuous course. At the parties' initial conference, we set deadlines for the exchange of various discovery materials, and imposed a discovery cutoff of August 31,

8

2007. (See Order dated April 13, 2007 ¶¶ 1-3). This discovery deadline was later extended to October 31, 2007, after another conference during which we directed Mr. Brown to provide discovery materials to defendant. (See Order dated June 8, 2007). When he failed to satisfy defendant's discovery requests by the scheduled dates, the union moved to compel production of discovery materials and to sanction Mr. Brown. We extended discovery to December 31, 2007 (see Endorsed Order dated November 2, 2007) and ordered plaintiff to respond to defendant's pending discovery requests but chose not to sanction Brown at that time. (See Order dated Dec. 20, 2007). In response to Brown's continued refusal to produce discovery materials, defendant moved for dismissal of the case. We recommended dismissal for plaintiff's failure to comply with discovery demands and for violating court orders directing him to respond. (See Report and Recommendation, 11-12, June 13, 2008). Judge Carter ordered compliance with the discovery requests but did not dismiss the claim. (See Op., 10, Aug. 18, 2008).[1]

Judge Carter once more referred this case to me for general pretrial purposes in 2009, after mediation between the parties had

---

[1] The plaintiff also filed two retaliation claims by the union with the EEOC, which he later dropped. (See Letter to the Court from Mr. Charles Brown, 1, June 23, 2008; see also April 22, 2009 Tr., 13).

failed. (See Order dated Feb. 24, 2009). At a conference, we extended discovery to May 28, 2009. (See Order dated April 23, 2009). During that conference, plaintiff expressed his intention to file a motion for contempt (see April 22, 2009 Tr. 7), and he subsequently filed such a motion, albeit in skeletal form. (See Pl.'s Mot. for Contempt, 2, April 18, 2009). Defendant responded by moving to dismiss plaintiff's contempt motion based on the same procedural faults previously addressed and rejected by the District Court. See Def.'s 2009 Resp.; EEOC v. Local 580, 139 F. Supp. 2d 512, 523-25 (S.D.N.Y. 2001). We denied the union's motion. (Order dated Dec. 16, 2009, 2).

We interpreted Mr. Brown's 2009 motion to be a request for the court to address the more fully fleshed out 1998 contempt motion and therefore ordered defendant to respond to that motion. (Order dated Dec. 16, 2009, 2). Defendant timely responded (Def.'s Mem. of Law in Opp'n to Pl.-Intevenor's Mot. for Contempt and Back-pay Claim ("Def.'s 2010 Resp."), February 11, 2010), and plaintiff in turn filed a document styled an "Amended Motion to Enforce the Consent and Agreement and Contempt of Court Order." We treat that submission as a reply in support of his pending contempt motion.

10

C.    The Parties' Arguments


    1.    Plaintiff-Intervenor's Motion


    Plaintiff-Intervenors Iran Bennett, Charles Brown, Leroy
Pratt, Fitzroy Trancoso, and Angel Vasquez filed a Motion for
Contempt with affidavits by the attorney and claimants on August
20, 1998, which they supplemented with a memorandum of law on
September 25, 1998. In the 1998 motion and plaintiff's subsequent
papers, Brown claims that the union has violated the 1978 consent
judgment and subsequent orders enforcing the 1978 judgment,
including the 1987 judgment and order, the April 1988 order
(corrected in May 1998), the December 1988 opinion, and the 1991
stipulation, order and judgment.


    The 1978 consent judgment permanently enjoined the union from:


        engaging in any act or practice which has the purpose or the
        effect of discriminating in recruitment, selection, training,
        admission to membership [in the union or the apprentice
        program] . . . or terms, conditions, or privileges with
        respect thereto against any individual or class of individuals
        on the basis of race, color, religion, sex or national origin.

(1978 Consent J., 8). The court also permanently enjoined the union
from excluding or expelling members, failing to refer union members

11

for work, or otherwise interfering with union members' work opportunities on the basis of race or other discriminatory criteria. (See id. at 8). It also mandated that members could only be hired through the referral hall or specific employer requests at job sites, shop or the referral hall. (See id. at 33). Other provisions of the consent judgment required the union to keep detailed records about union members and their employment histories, including the amount of time each member spent in the referral hall, the manner in which they were hired for any jobs they received and work actually performed. (See id. at 15-16). The judgment also required that the data be made available to the EEOC and union members upon request. (See id. at 30-33).

Subsequent orders affirmed the permanent injunction against discrimination and expanded the union's obligations. In the 1991 stipulation, the parties agreed, among other provisions, that the union would create a computerized record-keeping system to enable the EEOC to monitor hiring practices and implement a telephone referral system through which affiliated contractors would be required to hire 65% of their workforce. (1991 Back-Pay Stipulation, 29).

By way of affidavit, Mr. Brown stated in 1998 that, during the

12

seven years since the 1991 settlement, he had received very few work assignments despite regularly reporting to the referral hall and that he had observed non-minority union members receive job assignments in violation of the procedure outlined in the settlement agreement. (See Aff. of Charles Brown, ¶¶ 4-5, July 24, 1998). He and his fellow intervenors also alleged that the union had failed to develop the required computerized record-keeping system. (Pls.' 1998 Mem., 10). The movants claimed that, instead of implementing the equitable referral system ordered by the court, the union continued to rely on discriminatory employment practices and that they were therefore often unable to achieve the 1000 hours per year of work that was required for them to obtain pension credits and to earn health-care benefits. (Pls.' 1998 Mem. at 10). For relief, the movants requested compensation for wages and benefits denied them as a result of racial discrimination on the part of the union.

As noted, Mr. Brown was the only claimant who did not enter into the settlement for this period agreed to with the union in 2007. Accordingly, the practices of the union during this period are still at issue on the current motion. In 2009, Mr. Brown filed what he styled a "Motion Asking This Court for Contempt Ruling." In a one-page submission attached to his Notice of Motion, he gave a

13

short reiteration of the history of the case and requested that the
court find the union in contempt and enforce the consent decree. In
2010, he submitted a document entitled an "Amended Motion to
Enforce the Consent and Agreement and Contempt of Court Order,"
which we are treating as a reply in further support of the 1998
contempt motion. In this document, Brown requests compensation for
back-pay, pension, lost wages, tuition reimbursement, promotion
fund, and insurance fund, a claimed amount totaling $2,113,213.94,
which he asks be trebled, for a total of $6,339,695.82. (Pl.-
Intervenor's Rule 71 Mot. to Enforce Consent Decree and Award
Damages ("Pl.'s 2010 Reply"), 8, Mar. 20, 2010). In his attached
affirmation, Brown makes no new allegations of discrimination, but
again reiterates the procedural history of the case, and asserts
that the court has jurisdiction and that he has standing to sue to
enforce the prior consent decrees.

    2.    Defendant's Submissions in Opposition

    Defendant requests that this court deny plaintiff's motion for
contempt and limit his back-pay claim to $42,149.88. (Aff. of
Edward J. Groarke, Esq., 13, Feb. 10, 2010). The union states that
although it is entitled to a reduction in Brown's damages to the
extent of hours worked outside the union's jurisdiction, it is

willing to pay the full damage calculation made by the EEOC's expert. (Def.'s 2010 Resp., 16, fn. 6).

In defendant's 2009 response to the 1998 contempt motion, it concedes that the EEOC and union expert reports showed a statistically significant difference in paid hours in favor of non-minorities between January 1, 1992 and August 31, 1997. (See id. at 14-15). In the May 2007 order approving settlement of all claims, other than Mr. Brown's, for discrimination that occurred between 1992 and 2004, Judge Carter acknowledged these experts' findings. (Order dated May 7, 2007, 3, 5). The union thus effectively admits that it was in contempt for the period beginning in 1992 and ending August 31, 1997, and it focuses instead on the remedy, arguing that, through Brown's counsel at the time, he accepted the services of the EEOC's expert, Dr. Bloch, to calculate his back-pay claim for the contempt period and further that Brown agreed to be bound by Dr. Bloch's report of his damages as well as the expert's conclusions as to whether the union was in contempt of court orders. (Aff. of Groarke, 9-10; Def.'s 2010 Resp., 14-15). Defendant therefore contends that plaintiff is entitled to a maximum of $42,149.88, representing Dr. Bloch's assessment of his damages during the contempt period of 1992-1997. (Def.'s 2010 Resp., 16). In making this argument, the union relies on the 2003

15

Expert Report Stipulation, signed by Scott Korenbaum, Esq.. In response, Brown states that he believes the experts' calculations to be incorrect. (E.g., Letter to the Court from Charles Brown dated Sept. 5, 2007 (calculating his damages to be $725,000); Apr. 13, 2007 Tr.; Sept. 10, 2008 Tr.(calculating his damages to be $896,000)).

With regard to the later period -- September 1997 to 2004 -- the union argues that Brown neither makes sufficiently specific allegations of incidents of discrimination that would allow the union to investigate his claims (see Def.'s 2010 Resp., 6-7, 9-10, 17-25), nor carries his burden to prove contempt on the part of the union for this period. (See id. at 16-19). The union further argues that the experts of both the EEOC and the union agreed that there was no statistically significant difference in paid hours worked between minorities and non-minorities after August 31, 1997. (See Aff. of Groarke, 10). Therefore, it asserts, Brown's claim of discrimination for the later period must be analyzed as a typical Title VII employment-discrimination case, for which he has not proved discrimination. (Def.'s 2010 Resp., 16).

As for the limited evidence in the record pertinent to Brown's job history, the union notes that he testified at his deposition

that 90% of the companies for which he worked between 1992 and 2004 were located outside the jurisdiction of the union. (Def.'s 2010 Resp., 18 (citing Oct. 17, 2008 Dep. Tr., 62)). Accordingly, defendant contends, it cannot be held responsible for lost wages or benefits suffered by plaintiff when he was unavailable to work within the union's geographic jurisdiction or when he worked in trades outside the union's jurisdiction. (See Def.'s 2010 Resp. 18; Aff. of James P. Mahoney, 2-3, February 8, 2010).[2]

For the following reasons, we recommend that plaintiff's motion be granted insofar as it pertains to the period between January 1, 1992 and August 31, 1997 and that he be awarded $42,149.88. We further recommend that the plaintiff's motion be

---

[2] Apart from challenging the evidentiary adequacy of Brown's motion, the union requested its dismissal based on its various procedural deficiencies. These include (1) plaintiff's failure to satisfy Fed. R. Civ. P.7(b)(1) by not specifying which clauses of the various court orders the union allegedly violated and failing to state with sufficient particularity allegations of violation of these orders (see Def.'s 2009 Resp., 3-4); (2) plaintiff's failure to comply with S.D.N.Y. Civil Rule 7.1, which requires a memorandum of law, and Civil Rule 83.9, which requires specification of the conduct constituting a proposed contemnor's violation of court orders (id. at 4-5); and (3) the mootness of plaintiff's stated request for relief -- plaintiff-intervenor status to enforce the court's orders -- since he has already been granted such status. (Id. at 5-6). We have already denied defendant's motion on the ground that the district court had rejected these same procedural arguments when the union raised them in opposition to the 1998 contempt motion. (See Order dated Dec. 16, 2009, 2, citing E.E.O.C. v. Local 580, 139 F. Supp. 2d 512, 523-25 (S.D.N.Y. 2001)).

denied in all other respects.


## ANALYSIS


A. Standard for Assessing Motions for Contempt


The court has inherent authority to hold a party in civil contempt for violation of a "clear and unambiguous" court order, even if the violation was not willful. See, e.g., McComb v. Jacksonville Paper Co., 336 U.S. 187, 191 (1949); Perez v. Danbury Hosp., 347 F.3d 419, 423 (2d Cir. 2003); EEOC v. Local 638, 753 F.2d 1172, 1178 (2d Cir. 1985), aff'd, 478 U.S. 421 (1986). The party moving for contempt, however, bears the burden of proving the violation by "clear and convincing" evidence. See, e.g., Perez, 347 F.3d at 423; Local 638, 753 F.2d at 1178; N.A. Sales Co. v. Chapinan Industries Corp., 736 F.2d 854, 857 (2d Cir.1984). Finally, the movant must demonstrate that the accused "'has not diligently attempted to comply in a reasonable manner,'" Perez, 347 F.3d at 424 (quoting King v. Allied Vision, Ltd., 65 F.3d 1051, 1058 (2d Cir. 1995)), though the noncompliance need not be willful. See, e.g., Paramedics Electromedicina Comercial, Ltda. v. GE Medical Info. Techs., Inc., 369 F.3d 645, 655 (2d Cir. 2004).


18

The standard of "clear and convincing evidence," although "no stranger to the civil law," <u>Woodby v. INS</u>, 385 U.S. 276, 285 (1966), is perhaps less susceptible to a precise definition than the more commonly invoked standards of "preponderance of the evidence" and "beyond a reasonable doubt." See, e.g., <u>Addington v. Texas</u>, 441 U.S. 418, 425 (1979). Plainly, however, it requires more persuasive proof than the "preponderance" standard, and for present purposes can be adequately defined as requiring sufficient evidence to give the court substantial confidence in the correctness of the plaintiff's material factual allegations. Thus, although virtual certainty is not required, see, e.g., <u>id.</u> at 432 (proof need not be "unequivocal"), the plaintiff in this case must demonstrate that defendant has very likely violated one or more of the court's previous orders in specified ways. In other words, the contempt standard "requires a quantum of proof adequate to demonstrate a 'reasonable certainty' that a violation occurred." <u>Levin v. Tiber Holding Corp.</u>, 277 F.3d 243, 250 (2d Cir. 2002) (quoting <u>Callanan Indus., Inc. v. White</u>, 123 A.D.2d 56, 58, 510 N.Y.S.2d 230, 231 (3d Dept. 1986)).

B.   <u>The Relevant Time-Frame</u>

In formulating his ambitious demand for millions of dollars in

compensation, Mr. Brown does not specify the time frame on which he is focusing. In his deposition, however, he appeared to assume that he could collect compensation going back many years prior to 1992. (Jan. 14, 2009 Dep. Tr., 307-08). This is plainly not the case.

The back-pay claims stemming from the 1998 contempt motion are limited to the period from January 1, 1992 through August 31, 2004. (See Sept. 10, 2009 Tr., 3, 5 (limiting the scope of discovery to the period between January 1, 1992 and August 31, 2004); Order dated Sept. 16, 2008 ¶ 2 (ordering Brown to comply with discovery requests for the period of January 1, 1992 through August 31, 2004)). This limitation follows from the fact that his claims arising from the earlier period -- as well as those of the other claimants -- were resolved many years ago by settlement, with a payment to him for his alleged losses through 1991 in exchange for which he released the union for all claims arising from that period. (Pl.'s 1991 Release).

In short, the only relevant period for the present purpose begins in 1992 and ends in 2004. We therefore focus on the evidentiary record pertinent to that time frame, which consists principally of the findings and calculations of the experts for the EEOC and the union.

C.    The Experts' Findings Regarding Liability and Damages

Following the 1998 contempt motion and a similar motion for contempt filed by the EEOC in 2001, the parties -- including counsel for Brown -- agreed to adopt the findings and conclusions of the EEOC's expert and the union's expert, who determined the difference in hours worked by minority and non-minority union members and computed the measurable damages of each union member harmed by discrimination. (See 2003 Expert Report Stipulation, 4).

As described in the report of the union's expert, Dr. Stephyn G. Butcher, the calculation of damages was based on data from payroll records of paid hours, which includes overtime hours expressed as straight time hours (id. at 12), as well as membership data that reflects the race and status of union members. (Id. at 13). The experts agreed to conduct multivariate regression calculations, which yielded a refined T-statistic that described whether disparities in paid hours between minority and non-minority union members were statistically significant on the basis of race. (Id. at 14).[3]

---

[3] The multivariate regression methodology used by the experts in this case is comparable to that of Dr. Bernard Siskin, an expert whose calculations and conclusions were accepted by the district court under very similar facts and law. See E.E.O.C. v. Local 638, 889 F. Supp. 642, 660-62 (S.D.N.Y. 1995).

1.  Contempt and Damages for Apprentice Years 1991-1996

The two experts -- Dr. Bloch for the EEOC, and Dr. Butcher for the union -- agreed, with some extremely minor deviation in numbers, that based on a statistically significant disparity between the number of hours worked by minority and non-minority union members, the union had been in contempt of the injunction against discrimination between January 1, 1992 and August 31, 1997 (the end of "Apprentice Year" 1996). (2003 Expert Report Stipulation, 12). For apprentice years 1991-1996, standard deviation units ranged from three to nearly seven. (Id. at 12). This suggests strong statistical support for the proposition that race was a factor in determining the number of paid hours worked by members of Local 580.[4] Defendant offers no grounds to challenge these expert reports, and we can find none. In fact, the union's own expert, Dr. Butcher, noted that although the reports that contributed the raw data used in this analysis allowed for "limited . . . sophisticated analysis," and he concluded that his calculations "support[ed] the contention that race played a

---

[4] Courts have noted that "[w]hen a disparity is represented by two or more units of standard deviation, there is less than a five percent chance that the variation occurred randomly." Local 638, 889 F. Supp. at 660 (citing Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 311 n. 17 (1977)), aff'd in relevant part, rev'd on other grounds, 81 F.3d 1162, 1173 (2d Cir. 1996).

statistically significant factor . . . in a way that favored nonminorities" for the 1991-1996 apprentice years. (Id. at 17, 10 (revising his prior conclusions to confirm that there was a statistically significant disparity in 1993)). We also note that similar statistical methods and conclusions -- the use of multivariate regression to calculate a disparity of two or greater standard deviations, interpreted by experts to demonstrate a high likelihood of discrimination -- have been found by this court and others to be clear and convincing even in the light of strenuous objections by defendants. See E.E.O.C. v. Local 638, 2005 WL 823915, *4-8 (S.D.N.Y. April 8, 2005); Local 638, 889 F. Supp. at 663. Therefore, we find that the union was in contempt of the 1978 consent decree and subsequent orders enjoining racial discrimination from January 1, 1992 through August 31, 1997.

The experts' findings and conclusions as to the compensation owed to minority union members for the contempt period were also substantially similar to one another. (See 2003 Expert Report Stipulation Ex. D, 3 ("Mr. Butcher's back-pay total is $395 higher than [EEOC expert Dr. Bloch's total], a de minimus difference of less than 1/200 of one percent of the almost $9 million total")). Moreover, this methodology has not been meaningfully challenged here.

Dr. Bloch explained that damages were not calculated directly based on the hours shortfall -- the number of hours by which minority members' fell short of the threshold level for the year (the overall mean minus two standard deviations) -- because doing so would overcompensate minority members as a group. That is, at the same time that minority members who had worked less than the threshold number of hours would receive the difference, minority members who had surpassed the threshold would retain their wages for hours worked and thus minority members would be paid in total for more than the threshold number of hours. (<u>Id.</u>).[5]

Instead, the sum of all minority paid hours was subtracted from the mean number of paid hours, and that difference determined the number of hours for which minority members were to receive compensation. That difference was divided by the sum of paid hours of every minority member whose hours fell below the threshold level. This is the scaling factor, which varied year by year as the numbers of paid hours of minority and non-minority members changed.

---

[5] Dr. Bloch used specific numbers to clarify the arithmetic. In year X, the overall mean was 1000 hours, and minority members A, B and C worked 1800, 400 and 300 hours. The threshold level is 900, as calculated by subtracting two standard deviations from the total mean. If B and C are fully compensated up to the threshold, the total paid hours for the minority group is 1800 + 900 + 900, which skews the mean to 1200 (1800 + 900 + 900 = 3600, divided by 3). (<u>Id.</u>).

For each member whose hours fell below the threshold level, the experts multiplied the yearly scaling factor by the number of paid hours worked below the threshold. This formula, Dr. Bloch explained, yielded the correct amount of compensation because the number of hours worked by minority members who surpassed the threshold plus the adjusted hours for which the remaining minority members were paid equals the overall mean of the year.[6]

Finally, to calculate the amount of money owed to each claimant under this formula, Dr. Bloch multiplied the adjusted paid hours by the total value of Local 580's wage and fringe benefits. Salaries changed at the beginning of January and July, so the wage rate for each apprentice year was calculated as the sum of each of the fractions of the months worked at a particular rate divided by

---

[6] Again, Dr. Bloch's example may illustrate this more clearly. Using the same numbers from the prior footnote, the sum of all paid minority hours in the year X is 1800 + 400 + 300 = 2500. The difference between this number and the number that represents what all minority members would have worked if they had worked the mean number -- that is, 3000 -- is 500. Therefore, 500 is the total number of hours for which the minority group should receive compensation. The scaling factor is 500 divided by the total number of hours for which minority members fell below the threshold, which is 500 for member B (900 - 400) and 600 for member C (900 - 300) for a total of 1100: 5/11. The members' adjusted paid hours are thus 5/11 multiplied by their hours below the threshold, 500 and 600 respectively, which comes to 227 and 273. The total amount of hours for which minority members are compensated is 1800 for A, 400 + 227 for B, and 300 + 273 for C. This equals 3000, for which the mean is 1000, reflecting the overall mean for that year. (Id.).

25

twelve months multiplied by that particular rate. (<u>Id.</u>).[7]

Plaintiff opposes the proposed award derived for these calculations, but he does not demonstrate why it is erroneous. He states that he is requesting compensation for: back-pay, retroactive pension, lost wages, tuition reimbursement, promotion fund, and insurance fund. (<u>See</u> Pl.'s 2010 Reply, 7). He presumably calculated this sum from the myriad documents enclosed in Exhibit D to his 2010 Reply and arrived at a total of $2,113,231.94, which he trebles to arrive at $6,339,695.82. (<u>See</u> Pl.'s 2010 Reply, 8 & Ex. D). In his deposition testimony, he explained that he calculated his damages by multiplying the hourly wage and benefit rates, which he receives in a newsletter from the union, by the number of hours that he believed he should have worked with companies affiliated with Local 580, minus any money he earned working for non-affiliated companies. (Oct. 17, 2008 Dep. Tr., 120-121). It is unclear whether he includes in his calculations any benefits that he believes he is entitled to that predate 1992; he

---

[7] That is, apprentice year 1995 started September 1, 1995 and ended August 31, 1996. Members therefore earned the July-January 1995-96 rate for four months (September through December), earned the January-July 1996 rate for six months (January to July), and earned the July-January 1996-97 rate for two months (August and September). The total yearly wage is thus 4/12 at the first rate plus 6/12 at the second rate plus 2/12 at the third rate. (<u>Id.</u>).

stated to the Special Master his opinion that although he had released any claims to back-pay, he may still be entitled to damages for pension credits that he has not received during the entirety of his membership with the union. (Jan. 14, 2009 Dep. Tr., 307-08).

We reject plaintiff's calculations of the damaged owed to him by defendant. Plaintiff is precluded from recovering for conduct arising prior to the 1991 release he signed, which released the union from all claims of discrimination that had already arisen. (Pl.'s 1991 Release). As for the period postdating 1991 and ending August 31, 1997, plaintiff does not demonstrate any errors in the experts' parallel calculations of job-referral differntials and damages, nor does he provide us with an explanation or documentation of the methodology that he used to calculate his losses. Plaintiff's demand of over two million dollars, before trebling his total for punitive damages, is not only unsubstantiated, but plainly wildly excessive -- far more than is required to make him whole for undergoing five and a half years of discriminatory conduct by the union. See, e.g., E.E.O.C. v. Joint Apprenticeship Committee, 164 F.3d 89, 101 (2d Cir. 1998) (describing the purpose of back-pay awards as redressing economic injury suffered by plaintiff as a result of discrimination) (citing

<u>Saulpaugh v. Monroe Cmty. Hosp.</u>, 4 F.3d 134, 125 (2d Cir. 1993)).[8]
Moreover, Brown's deposition testimony demonstrates that he did in
fact earn money working through out-of-state unions during the
1992-2004 period (Dec. 2, 2008 Dep. Tr., 221-42), and that he often
failed to sign the sign-up list for job referrals. (Oct. 17, 2008
Dep. Tr., 70-71). In short, we find his damage demands to be
entirely unsupported. In contrast, the experts' liability and
damage calculations for this period -- which closely coincide --
are clear, precise and logical and satisfy us that $42,149.88 will
sufficiently redress plaintiff for the 1992 to August 1997 portion
of the contempt period.

In sum, we recommend that Mr. Brown be awarded $42,149.88 for
racial discrimination that both the EEOC and union experts agree
the union engaged in through August 1997.

## 2. Contempt and Damages for September 1997 through 2004

For the period following August 1997, the union disputes
whether any discrimination occurred. Although plaintiff previously

---

[8] Plaintiff's demand covers more than the period from 1992
through August 1997. Nonetheless, however allocated, his numbers
are ungirded by any meaningful evidence, and in respect of the
1992 to 1997 period, the experts' parallel calculations are
unrebutted.

agreed through his then-counsel to adopt the findings of the EEOC expert, who stated in his report that statistical data did not show discrimination by the union after 1997 (2003 Expert Report Stipulation, Ex. D, 1-2), we will nevertheless analyze the merits of his claim of contempt -- that the union continued to discriminate against him on the basis of his race in violation of court orders -- for the years 1997 through 2004, an assertion that he must prove by clear and convincing evidence.

As we have stated, plaintiff has the burden to prove three elements necessary to succeed on his motion for contempt: (1) the existence of a clear and unambiguous order that defendant is alleged to have violated, (2) clear and convincing evidence of defendant's violation of the order and (3) a failure by defendant to make diligent efforts to comply with the order in a reasonable manner. See, e.g., Latino Officers Ass'n City of New York, Inc. v. City of New York, 558 F.3d 159, 164 (2d Cir. 2009) (quoting King, 65 F.3d at 1058); United States v. O'Rourke, 943 F.2d 180, 189 (2d Cir. 1991).

(a). The Court Orders Were Clear and Unambiguous

Defendant does not contend that any of the court orders that

29

it is alleged to have violated are unclear; indeed, it has
summarized succinctly in its papers the specific obligations that
this court placed on defendant during the pendency of this case.
(See Def.'s 2009 Resp., 1-3). The 1978 Consent Judgment  enjoined
the union from engaging in discriminatory practices and ordered it
to implement an affirmative-action program, and later decisions
confirmed the injunction and strengthened the measures that the
union was to take to correct discrimination that had occurred.
Plaintiff's 1998 motion similarly describes the import of various
court orders in this case. We conclude therefore that the court
orders that defendant is alleged to have violated are clear and
unambiguous.


   (b). Plaintiff Fails to Offer Clear and Convincing Evidence
        that Defendant Engaged in Racial Discrimination or
        Otherwise Ignored Their Affirmative Obligations in an
        Manner that Injured Him


   Plaintiff offers sweeping, conclusory allegations of racial
discrimination on the part of defendant but does not describe any
specific instances in which either he did not receive a job for
which he was qualified or the union fell short of the obligations
imposed on it by the court-ordered affirmative action plan and
thereby injured him. In consideration of plaintiff's pro se status,
we look beyond plaintiff's motion papers to deposition transcripts

provided by defendant as well as plaintiff's submitted employment diary in our search for clear and convincing evidence of contempt.

In the 1998 motion for contempt, plaintiff submitted an affidavit in which he stated that he had "received practically no work assignments," had "reported to the hiring hall morning after morning," had "witnessed non minority members get job assignments over myself," and had "witnessed union officials ignore the objective criteria specified for the hiring hall and give work to individuals other than minorities." (Brown Aff. ¶ 4). As a result of this conduct, he concluded, he had "lost hundreds of thousands of dollars." (Brown Aff. ¶ 7). This affidavit could be sufficient to make an initial complaint of employment discrimination, see Bell Atlantic Corp. v. Twombly, 550 U.S. 554, 569 (2007) (requiring that plaintiff state in its complaint "only enough facts to state a claim to relief that is plausible on its face"), but its vague assertions -- which do not target the period post-dating August 31, 1997 -- fall far short of clear and convincing evidence of a violation that injured him subsequent to August 31, 1997.

Plaintiff provides even less in the way of evidence in his 2009 papers, offering merely a brief timeline of the case and reiterating his request for an order finding the union to be in

31

contempt. (Pl.'s 2009 Mot.). Finally, in his 2010 reply papers, he elaborates on the procedural history of the case, reminds the court of its continued jurisdiction over the matter and asserts his standing to sue. (Pl.'s 2010 Reply). The only reference he makes to misconduct supposedly engaged in by the union since the issuance of prior court orders is his concluding request for relief in the amount of $6,339,695.82 in damages, "which he has been unlawfully and illegally denied by the defendant." (Id. at 9).  Plaintiff's employment diary and defendant's deposition of him offer more insight into Mr. Brown's allegations, but these too fail to present clear and convincing evidence of discrimination.


During the time of his union membership, plaintiff sporadically kept an employment diary, which he proffered to defendant as evidence of discrimination that he suffered. The pages are not arranged in chronological order despite handwritten page numbers at the top of every submitted page, and several are illegible. (Pl.'s Employment Diary, 6-7, 17-18). Plaintiff made note of sporadic visits to the referral hall, telephone calls and other conversations with fellow union members, some of which resulted in him acquiring work (id. at 9, 12, 15, 25, 31, 35, 44-45, 48, 52) -- which he refused on at least one occasion (id. at 20, 33; see also Dec. 2, 2008 Dep. Tr., 257-62) -- and others of

32

which did not. (Pl.'s Employment Diary, 1, 10, 19, 28, 29, 45, 46).
He also recorded instances in which he was terminated from jobs,
but without any suggestion of racial animus (id. at 8, 19), and on
one occasion he stated that a termination was due to his tardy
arrival at the job site. (Id. at 31). He did allege a handful of
instances in which a white worker received a job that he believed
he deserved (id. at 3-5, 36, 46), including a notation that
somebody "signaled" a fellow union member, presumably white, for a
job referral. (Id. at 40).

Plaintiff revealed in his deposition testimony that he had
traveled to Ohio to picket and to work "a few jobs" between 1992
and 1994. (Oct. 17, 2008 Dep. Tr., 27-28). He also found employment
with sixteen other unions during several of the years in dispute,
including at job sites outside New York State (id. at 36-42, 60-62;
Dec. 2, 2008 Dep. Tr., 220-224), for up to five months at a time.
(Oct. 17, 2008 Dep Tr., 76). In total, he estimated that between
1992 and August 2004, about 90% of the employers for whom he worked
were located outside the State of New York. (Id. at 62; see also
Dec. 2, 2008 Dep. Tr., 221-242). He further estimated that, between
1992 and 2004, he had worked about 1200 hours with companies
affiliated with defendant. (Oct. 17, 2008, Dep. Tr., 65). Morever,
union records demonstrate, and plaintiff agrees, that Mr. Brown did

not shape the hall even once from September 2000 through August 2004. (Id. at 70-71).

   In response to defendant's request for specific instances of discriminatory conduct, plaintiff stated that 98% of people who signed up on the out-of-work lists at the union hall were minorities and that when they did receive work, it came in the form of short-term jobs after white union members had worked most of the job. (Id. at 100-01). He recalled that sometime in 1997, he had witnessed a union member named Dennis Milton "give a wink" to a traveler from an outside union, presumably white, and give him a job when they met up in the street. (104-05). According to Mr. Brown, one of his fellow intervenors, Angel Vasquez, told him that the same Mr. Milton had become angry with Mr. Vasquez for helping Mr. Brown get a job in the Bronx in 1996 or 1997. (Id. at 106, 124-25). He admitted, however, that he had never reported either of these incidents to union officials. (Id. at 107). Mr. Brown continued that, in January of 2000, at a job site in Chelsea, he was laid off while a traveler from another union in the same position stayed on. (Id. at 108-09). He did complain about this incident to a business agent named Jimmy Mahoney, who apparently took no further action. (Id.).

34

Referring back to an early period, sometime in the 1990s -- perhaps 1992 or 1997 -- Mr. Brown reported that he had been terminated from a job site in Manhattan where he had previously enjoyed a collegial working relationship with the foreman and was told that he had been fired because of legal action he had taken against the union. (Id. at 110-12). More generally, plaintiff stated that union business agents had good working relationships with company foreman, which resulted in his early termination from jobs because of apparent racial or retaliatory animus held by union agents against him. (Id. at 115-16). He recalled one such termination from a job site in Battery Park City, the year of which he could not remember; Mr. Mahoney again was the union business agent for this job. (Id. at 117-18). Finally, he saw travelers from other unions get jobs from the union hall in 1997 and 1998 even though, in his opinion, he and other minority union members were entitled to receive those jobs. (Id. at 127-28).

Plaintiff's testimony and his documents fall well below the standard of clear and convincing evidence required to prevail on a motion for contempt. His conclusory allegations of racial discrimination --insofar as they pertain to the apprentice years 1997 to 2004 -- are not supported by statistical evidence, by testimony based on personal knowledge or by any competent evidence

of systematic wrongful conduct on the part of the union. Indeed, his employment diary suggests that he succeeded in finding work at the union hall as often as he could not find work, and the instances in which he did not find work are too sporadically and sparsely described to offer persuasive proof that the union engaged in racial discrimination by preventing him from finding work. In addition, his deposition testimony reveals that he spent a significant amount of time during the disputed period traveling, during which time he could not be physically present to shape the hall. His sweeping contentions that white union members were disproportionately employed full-time are not supported by the statistical findings of both the EEOC's and the union's experts; indeed they both found that during a number of those years minority union members worked more hours than non-minority union members. (2003 Expert Report Stipulation, 12 (showing that, for Apprentice Years 1997 to 1999 and 2001, minority union members worked a higher average number of hours than nonminority union members)), and none of the anecdotes that he describes indicate a racial animus against him.

We need proceed no further in our inquiry concerning the three-part test for contempt, though we briefly note that the statistical evidence demonstrating that minority union members have

36

achieved a similar, and at times greater, average of employed hours

(2003 Expert Report Stipulation Ex. D, 1-2)[9] persuades us that the

union is taking reasonable steps to comply with past court orders

enjoining racial discrimination.

## CONCLUSION

For the reasons noted, we recommend that plaintiff's motion

for contempt be granted only for the period 1992 to August 31,

1997, that plaintiff be awarded $42,149.88 for that period, and

that his motion be otherwise denied.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure,

the parties shall have ten (10) days from this date to file

written objections to this Report and Recommendation. Such

objections shall be filed with the Clerk of the Court and served

on all adversaries, with extra copies to be delivered to the

chambers of the Honorable Lewis A. Kaplan, Room 1310, 500 Pearl

Street, New York, New York 10007 and to the chambers of the

---

[9] EEOC expert Dr. Bloch notes that the t-statistic, which measures the deviation between the number of hours worked by non-minority and minority union members, was negative in 1997, 1998, 1999, and 2001, which means that minority mean hours exceed non-minority mean hours. In 1997, the t-statistic was -1.92; in 1998, the t-statistic was -2.54; in 1999, the t-statistic was -1.56; and in 2001, the t-statistic was -.39. (Id. at 2).

undersigned, Room 1670, 500 Pearl Street, New York, New York 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985); DeLeon v. Strack, 234 F.3d 84, 86 (2d Cir. 2000) (citing Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir.1989)); 28 U.S.C. 5636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: New York, New York
       March 11, 2011

MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE

Copies of the foregoing Report and Recommendation have been mailed today to:

Edward J. Groarke, Esq.
Colleran, O'Hara & Mills
1225 Franklin Avenue, Suite 450
Garden City, New York 11530

Mr. Charles Brown
192 Shady Brook Lane
Pomona, New York 10970