USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___10/22/2019___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
EQUAL EMPLOYMENT OPPORTUNITY,        :
COMMISSION, THE CITY OF NEW YORK,    :
and THE NEW YORK STATE DIVISION OF   :
HUMAN RIGHTS,                        :          71 Civ. 2877 (LAK) (RWL)
                                     :
                    Plaintiffs,      :
                                     :
and                                  :
                                     :          **DECISION AND ORDER:**
                                     :          **LOCAL 28 APPLICATION TO**
THE HISPANIC SOCIETY and INDIVIDUAL  :          <u>**TRANSITION MAP/ETER SERVICES**</u>
NONWHITE LOCAL 28 MEMBERS,           :
                                     :
                    Intervenors,     :
                                     :
          - against-                 :
                                     :
LOCAL 638, ETC; LOCAL 28 OF THE      :
SHEET METAL WORKERS'                 :
INTERNATIONAL ASSOCIATION, et al.    :
                                     :
                    Defendants.      :
-------------------------------------------------------------X

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**


                              **Introduction**

        1.      The United States filed this action on June 29, 1971 to redress systemic

race and national origin discrimination against black and Hispanic journeypersons and

apprentices by certain unions, including Defendant Local 28 of the Sheet Metal Workers'

International Association ("Local 28" or the "Union").[1]  The current Plaintiffs are the Equal

Employment Opportunity Commission ("E.E.O.C."), the City of New York (the "City"), the

_____

[1] The case dates back even further to 1964 when New York State filed suit against Local
28 in response to the Union's refusal to admit black members as apprentices.  *E.E.O.C.
v. Local 638*, 889 F. Supp. 642, 642-649 (1995) (describing procedural history).

New York State Division of Human Rights (the "State") and intervenor plaintiffs The Hispanic Society and Nonwhite Members of Local 28 (the "Class").[2]

2.      Since judgment was entered against it in 1975, the Union has been subject to a multitude of constraints and affirmative action requirements imposed to remedy past discrimination, prevent future discrimination, and punish the Union for recurring contempt. Three of those measures include a requirement to provide certain services called the "MAP/ETER Services," compulsory payments to a "MAP/ETER FUND" to finance those services, and oversight by a Special Master.

3.      Pursuant to a March 5, 2015 court order titled the Structural Changes Order ("SCO") (Dkt. 385-1), the Union may apply to transition operation of the MAP/ETER Services from the Special Master to the Union if the Union can demonstrate that it is capable of adequately providing the services.  The Union has applied to do precisely that. All Plaintiffs – the E.E.O.C., the City, the State, and the Class – fully support the Union's application.  (Dkt. 384.) The Special Master opposes it. (Dkt. 385.)  The question now before the Court is whether the Union may proceed with transition.  For the reasons set forth below, the Court concludes that the Union may do so.

4.      The Court assumes the parties' familiarity with the facts and decades-long history of this case as set forth extensively in numerous court decisions and orders, beginning with the original decision after trial issued in 1975.[3]  With respect to the present

---

[2] The term "nonwhite" as used in this case specifically refers to black and Hispanic.

[3] *See E.E.O.C. v. Local 638 et al.*, 401 F. Supp. 467 (S.D.N.Y. 1975) (findings of fact and conclusions of law after trial); *E.E.O.C. v. Local 638 et al.*, No. 71 Civ. 2877, 1975 WL 11915 (S.D.N.Y. Sept. 2, 1975) (Order and Judgment imposing remedies); *E.E.O.C. v. Local 638*, 532 F.2d 821 (2d Cir. 1976) (affirming the decision after trial and affirming

issue, the parties and the Special Master have submitted three rounds of briefing and exhibits.[4]  The Court held argument at a preliminary hearing on July 24, 2019 and a more fulsome hearing on September 12, 2019.  The Court bases its decision on the parties' submissions, oral argument, and the prior proceedings in this case.

**Discussion**

**I.    The Union Has Met Its Burden Under the SCO to Proceed with a Trial Period of Transition.**

**A.    The Union Has Demonstrated that It Is Capable of Adequately Providing the MAP/ETER Services.**

5.    The SCO has several sections, the most relevant of which here is Section VI: "MAP/ETER FUND."  Paragraph 44 provides: "If and when Local 28 determines that it is in a position to provide the services currently provided by the MAP/ETER FUND (the 'MAP/ETER Services'), Local 28 may seek to transition all such services to Local 28 and its appropriate Funds and Plans by making an application to the Court to demonstrate that it is capable of adequately providing the MAP/ETER Services (the 'Transition Application.'")) (SCO ¶ 44.)

6.    The MAP/ETER FUND is the "Employment, Training, Education and Recruitment Fund" established in 1983 as a depository for coercive fines imposed on the Union for violating the original Order and Judgment of 1975 ("O&J") and another order – the Revised Affirmative Action Program and Order – issued in 1977.

---

most of the remedies imposed); *Local 28 v. E.E.O.C. et al.*, 478 U.S. 421 (1986) (affirming remedies imposed as modified).

[4] The last round of briefing provided by the parties was in the form of a presentation for oral argument on September 12, 2019. (*See* Dkt. 406, a copy of the slide deck presented during oral argument.)

7.     The parties agree that the phrase "services currently provided by the MAP/ETER FUND" in Paragraph 44 of the SCO refers to those services provided at the time the SCO was agreed to and ordered by the Court in 2015.  (*See* Transcript of September 12, 2019 Oral Argument, Dkt. 403 ("Tr.") at 15.)

8.     Over its history, the MAP/ETER FUND has been used for a variety of purposes such as on-the-job training and funding educational opportunities aimed at furthering the hiring of nonwhite journeymen and apprentices in the sheet metal trade. Currently, the fund is used primarily for MAP (Member Assistance Program) services as well as for the Referral Hall, which was established as a means to affirmatively fill sheet metal jobs with nonwhite Union members.  (*See* Dkt. 383 at 2.)

9.     The Referral Hall had existed for many years at the time of entry into the SCO.  Accordingly, MAP/ETER Services as used in the SCO includes both MAP Services and the Referral Hall. (*Id.* at 3-4.)

10.     The standard set forth in SCO for the Union's right to apply for transition requires the Union to demonstrate that it is "capable" of "adequately providing" the MAP/ETER Services. (SCO ¶ 44.) In support of its Transition Application, the Union has submitted specific plans for how it will provide the MAP and Referral Hall services.  (*See* Local 28's Application to Transition MAP/ETER Services dated March 22, 2019, Dkt. 383 ("Transition Application") at 11-15 ("MAP Transition Plan") and 16-19 ("Referral Hall Transition Plan").)

11.     The Court finds that the Union has demonstrated that those plans – which employ independent outside services and monitoring – provides the Union with the capability to adequately provide the MAP/ETER Services.  Indeed, the Union's plans and

elaboration on those plans at the hearings, indicate that the Union will be able to deliver the MAP/ETER Services commensurately with the delivery of those services as heretofore provided by the Special Master.

**B.   Approval is for Only a Trial Period**

12.     Per the terms of the SCO, approval of the Union's Transition Application allows the Union to assume operation of the MAP/ETER Services only on a trial basis during which time it will be carefully monitored:  "If and when a Transition Application is approved by the Court, there will be a monitoring period (the "Monitoring Period") of at least one (1) year to ensure that Local 28 is, in fact capable of adequately providing the MAP/ETER Services."  (SCO ¶ 45.)

13.     During that trial period, the Union will be monitored by an independent consultant, retained at the Union's expense.  The Union may free itself of monitoring by the independent consultant only if and when, following at least one year, the Union demonstrates that it it has adequately transitioned the services "and is capable of continuing them without further monitoring."  (*Id.* ¶ 46.)

14.     The Union also will be required to provide quarterly reports to the Special Master and the Plaintiff concerning the Union's provision of the MAP/ETER Services both before and after the period during which it is monitored.  (*Id.* ¶ 47.)

15.     Approval of the Transition Application thus is not approval of a permanent change.  Rather, it is merely approval of a trial period, during which the services provided by the Union will be overseen by an independent consultant, the Special Master and the Plaintiffs.

16.    Transition of services also is not the same as an end to compliance with court orders; nor is it an end to judicial supervision of the Union.  Separate and apart from the Transition Application, the SCO contemplates a much more comprehensive Exit Plan to be formulated and overseen by an Exit Committee.  (*See* SCO Section VIII.)  The purpose of the Exit Plan is to "reliev[e] Local 28 of the Court's supervision" while "continuing to comply with its directives after such supervision is ended."  (SCO ¶ 56.)

17.    Transition as sought here by the Union thus is only an initial, modest step toward independence from court supervision that began over 40 years ago.

**C.    Consequences of Transition Plan Approval**

18.    Approval of the Union's Transition Plan materially affects the MAP/ETER FUND currently used to pay for MAP/ETER Services.  Paragraph 44 of the SCO provides that the "Funds" used to pay for the services will transition to the Union along with operation of the services.  That makes sense, given the nexus between the services provided and the funds used to pay for them.

19.    Additionally, the SCO has financial consequences for the 400 or so Class members who receive back pay.[5]  Specifically "If and when the Transition Application . . . is approved by the Court, Local 28 will pay an additional ten (10) cents into the Back Pay Account for each Eligible Hour Worked . . . on or after the date the Transition Application is approved by the Court (the 'MAP/ETER Contribution')."  (*Id* ¶ 48.)

---

[5] Class members who have claims relating to work during the period of April 1, 1991 through June 30, 2006 received a backpay award pursuant to the Consent Order Resolving Back Pay Claims.  *See* Consent Order Resolving Back Pay Claims for the April 1, 1991 through June 30, 2006 Period, dated January 11, 2008, Dkt. 136.

20.     The Union's obligation to make the MAP/ETER Contribution, however, expires in July 2020, five-plus years after the parties agreed to the SCO.   (*Id.* ¶ 48.)

21.     Any financial benefit from the additional ten cents per eligible work hour that class members will receive as a result of the Court's approval of the Union's Transition Application thus has a limited life and diminishes by approximately $32,000 each month. As of the end of September 2019, the amount of additional back pay that would have flowed from approval of the application was approximately $321,000.   (Dkt. 406 at 10.)

22.     That diminishing return, however, should not and does not have any influence on a determination of whether the Union has met the requirements for approval of its Transition Application.

## II.     The Special Master's Concerns

23.     In opposing the Union's Transition Application, the Special Master has articulated a number of concerns.  The Court addresses these below.

24.     Before doing so, however, the Court wishes to make clear that this Decision is in no way a criticism of the Special Master.  To the contrary, the Special Master has proven himself to be extremely diligent, thoughtful, and knowledgeable.  His briefing on the present issue is thorough and detailed and evinces considerable command of the long history of the case.  The Special Master also has displayed eminent respect for his role as a steward of the Court's mandate, deeply committed to seeing that the original and continuing goal of the case – to remedy discrimination – is fully satisfied.[6]

---

[6] Explaining the role of the Special Master, the Court long-ago recognized that "he is not a neutral person."  Rather, "[h]e is the executor of the order and judgment of the court and its alter ego and, to that extent, he is partisan to the letter and spirit of the court's judgment." *E.E.O.C. v. Local 28*, 421 F. Supp. 603, 620 (S.D.N.Y. 1975).

25.    Nonetheless, the Court is left with the firm conviction that the requirements for approving the Transition Application have been met and that the concerns raised by the Special Master do not warrant denial of this next step endorsed by all parties.[7]

**A.    Substantial Compliance is Not the Applicable Standard**

26.    One of the Special Master's primary arguments against transition of services at this time is that the Union has not yet achieved substantial compliance with multiple aspects of the various orders to which it is subject.[8]  (*See* Special Master's Report and Recommendation in Opposition, April 2, 2019 (Dkt. 485) ("SM Report") at 15-17; Special Master's Supplemental Report, dated April 11, 2019, Dkt. 387 ("SM Supp.") at 3-4.)

27.    The SCO provisions concerning transition of services nowhere impose a substantial compliance standard for approval of the Union's Transition Application.  As explained above, the express and unambiguous standard is whether the Union can demonstrate that it is capable of adequately providing the MAP/ETER Services. (*See* SCO ¶ 44.)

---

[7] In making this determination, the Court is mindful of the standards for considering the findings and conclusions of the Special Master.  A court reviews *de novo* all objections to to findings of fact made or recommended by the Special Master, Fed. R. Civ. P. 53(f)(3), as well as conclusions of law made or recommended by the Special Master, Fed. R. Civ. P. 53(f)(4).

[8] In his most recent filing, the Special Master opined that substantial compliance would be the standard to transfer both the MAP and Referral Hall services but some lesser standard would apply to transfer of the MAP counseling services alone. (Special Master's Response to Court's Local 28 Transition Plan Application Questions, dated September 11, 2019, Dkt. 401 ("SM Response To Questions") at 1-2.)  The Court does not find a defensible basis to parse the standards depending on which ETER/MAP Services are transferred; nor can doing so be reconciled with the express terms of the SCO ¶ 44.

28.     The Union's Transition Application does not ask the Court to modify the terms of any of the its past orders.  To the contrary, the Union seeks to enforce the express terms of the Court's orders, namely Paragraph 44 of the SCO.

29.     Indeed, when formulating the SCO, the parties rejected the Special Master's recommendation to impose the substantial compliance standard to trigger the right to transition.   The Special Master ultimately acquiesced to the parties' wishes, and agreed not to include the substantial compliance standard.  (*See* SM Report at 8.)  Accordingly, the substantial compliance standard may not now be invoked against the Transition Application.[9]

30.     The Special Master argues that even though the Union has not applied to modify the Court's orders, substantial compliance must be shown because the consequences of transitioning the MAP/ETER Services as the Union proposes in fact will improperly modify the Court's remedial orders, in particular, by eliminating payment of

---

[9] It is not entirely clear that the Second Circuit applies a "substantial compliance" standard for modifying decrees.  Modification of a court order or judgment is governed by Fed. R. Civ. P. 60, which permits modification for a variety of reasons, including "(5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment." As explained by the Second Circuit in a case cited by the Special Master: the "party seeking an alteration bears the initial burden of establishing that a significant change in circumstances warrants the modification." *Barcia v. Sitkin*, 367 F.3d 87, 99 (2d Cir. 2004) (citing *United States v. Secretary of Housing & Urban Development*, 239 F.3d 211, 217 (2d Cir.2001) (citing *Rufo v. Inmates of Suffolk County*, 502 U.S. 367, 383 (1992)).  Of course, substantial compliance with a court order's requirements could be one way to demonstrate a significant change in circumstances. *See Barcia*, 367 F.2d at 102-06 (affirming district court's determination that defendant had not demonstrated substantial compliance).

coercive fees that contribute to the ETER/MAP Fund.  (*See* SM Report at 18; SM Supp. at 4-5.)

31.     That argument overlooks, again, the fact that the SCO expressly calls for transferring the MAP/ETER Fund with the services it funds.  (SCO ¶ 48.)  The net effect of transition, as the parties concede, will be that the Union ceases contributing to the MAP/ETER Fund, but that is in part a function of the Union's taking over responsibility for providing the services it previously funded someone else – the Special Master – to provide.[10]  In other words, by expending resources to provide the MAP/ETER Services, the Union will still be funding coercively-imposed requirements.

### B.     Impact on Special Master's Resources

32.     Another of the Special Master's principal concerns is that terminating the Union's contributions to the MAP/ETER FUND will "strip[] away his professional, information technology, counseling and support staff."  (SM Report at 2-3; *see also* SM Supp. at 5.)  This is no small concern.  For decades, the Special Master has been the Court's guiding eye in overseeing the Union's compliance with the Court's remedial orders.  The Special Master employs a staff of several individuals, retains consultants, rents office space and incurs other overhead expenses to carry out his operations.  The Union's MAP/ETER Fund is an important source of funding for those costs.[11]

---

[10] Pursuant to the SCO, a portion of the funds (ten cents per eligible hour worked) previously devoted to the MAP/ETER Fund will be diverted for a limited time to Class members receiving back pay.

[11] In 2018, the Union's contribution to the MAP/ETER Fund was $1,715,760.  Other lesser sources include the Local 28 Joint Apprentice Committee, the Local 25 Joint Apprentice and Training Committee, and Sheet Metal Workers Local 25.  (Transition Application at 4-5.)

33.     All that said, implementing the Union's Transition Plan will not deprive the Special Master of the ability to do his job.  First, the Special Master will lose none of his authority (as distinct from resources) to oversee the Union.

34.     Second, some of his staff members will no longer be needed because their functions will be served by persons employed by the Union or its contractors; alternatively, the Union has expressed a desire to hire some of the Special Master's staff directly to maintain continuity.

35.     Third, the Union will continue to pay the Special Master on an hourly basis, will pay for consultants to the Special Master, and will continue to separately pay the Field Monitor who reports to the Special Master. (Tr. at 17-18, 40-41, 55.)  The Special Master may well lose the ability to pay for separate offices and overhead expenses, but he will be able to continue to fulfill his role from the law firm of which he is a member.  (Tr. at 55.)

36.     In short, approval of the Transition Application is not likely to have the impact on the Special Master to the extent he foresees. Regardless, whatever lesser impact it does have on the Special Master's resources is a direct consequence of the terms of the SCO.

**C.     The Referral Hall May Be Included in the Transitioned Services**

37.     The third of the Special Master's more prominent objections is to the Union's including the Referral Hall in the Transition Application.  (SM Report at 26-28; SM Supp. at 10-11.)

38.     The Referral Hall plays an acutely important function in remedying discrimination.  It exists to ensure that nonwhite journeymen and apprentices will be referred for jobs.  (*See* SCO, Section IV ("Required Use Of The Referral Hall").)  As set

forth previously, the Union has proposed a suitable plan for how it will operate the Referral Hall.

39.     The Special Master, however, makes a number of arguments as to why the Referral Hall should not be included in the transition.  First, the Special Master contends that the Referral Hall is not part of the MAP/ETER Services and therefore not even within the scope of transition pursuant to Paragraph 44 of the SCO.  But as explained earlier, the Referral Hall is funded by the MAP/ETER Fund and therefore is a MAP/ETER Service.

40.     The Special Master further argues that putting the Referral Hall directly in the Union's hands will have deleterious effects, such as inhibiting nonwhite participants from registering complaints.  This is speculative, and no evidence submitted to the Court suggests that this will be a problem.

41.     Additionally, the Special Master expresses much concern that the Union has not sufficiently integrated its computer technology needed to facilitate production of more reliable and timely data and which is a court-ordered requirement.  As the parties point out, however, the computer systems and data specific to the Referral Hall are fully functional, do not present the same issues as integration of other systems, and, in any event, will be the same systems and data previously used by the Special Master in connection with the Referral Hall.  (*See* Tr. at 20, 22-23.)

42.     Finally, the Special Master argues that the Union has not been pro-active in enforcing violations of Referral Hall rules and emphasizes that statistical disparities between whites and nonwhites remain, thus indicating that the Union cannot be relied on to operate the Referral Hall.  (SM Report at 13.)  The parties agree that some disparities

exist, even beyond the Referral Hall, and remain to be addressed.[12]  As explained earlier, however, neither perfection nor substantial compliance is required to permit transition of services.[13]

### D.  Lack of Trust in "Trust Us"

43.     The Special Master faults the Union's application and professed commitments as essentially a plea to "trust us."  (*See* SM Supp. at 5-7.)  And according to the Special Master, the Union cannot be trusted given its prior history of defiance and repeated contempt of court orders.

44.     The less-recent history of this case provides ample support for the Special Master's concerns.   For many years following the O&J, the Union denied that it discriminated and refused to abide by court orders. As its contempt citations mounted in 1995, 1998 and 2005, the Union incurred firmer and more expansive remedies.  *See, e.g., E.E.O.C. v. Local 638*, 889 F. Supp. 642 (S.D.N.Y. 1995), *affirmed in part, reversed in part*, 81 F.3d 1162 (2d Cir. 1996); *E.E.O.C. v. Local 638*, 13 F. Supp.2d 453 (S.D.N.Y. 1998), *affirmed in part, reversed in part*, *City of New York v. Local 28*, 179 F.3d 279 (2d

---

[12] "[N]onwhite members, especially African-Americans, remain underemployed as compared to white members and there continues to be, as there has been since 1991, a statistically significant work hours disparity between nonwhite members and white members."  (SM Report at 12.)

[13] Notwithstanding current disparities, the overall numbers indicate dramatic improvement and remediation over time.  For example, prior to the last contempt order in 2005, 34% of Union members were nonwhite; at present, the majority of members are nonwhite:  51% of journeypersons, and 70% of apprentices.   Similarly, until June 2004, no nonwhite journeyperson had ever held elected office; at present, 40% of elected leadership is nonwhite.  (Dkt. 406 at 25.)

Cir. 1999); *E.E.O.C. v. Local 638*, No. 71 Civ. 2877, 2005 WL 823915 (S.D.N.Y. April 8, 2005).

45.     As the preceding citations show, however, the last finding of contempt against the Union was in 2005, more than 14 years ago.  The parties, including the Union, agree that in those earlier "bad days," the Union was openly defiant.[14]

46.     Plaintiffs, however, represent that with new leadership that took over around 2006, the Union's behavior and attitude has entirely changed for the better.  (Tr. at 29.) The Special Master disagrees with the extent of the change, noting that while there has been improvement, the Union still has been slow to fully implement various requirements such as unified computerization.  (*See* SM Supp. at 6-7, 28; SM Response To Questions at 7.)

47.     The Court forms no opinion as to whether the Union can be "trusted" and agrees with the Special Master that a "trust us" entreaty is not a valid consideration for determining whether the Transition Application should be approved.  Rather, the standard for doing so is provided by Paragraph 44 of the SCO, which, as explained above, the Union has met.

**E.     Transition Does Not Treat Class Members Unequally**

48.     Lastly, the Special Master posits that transitioning the MAP/ETER Fund to the Union "would effectively partition the class into pre-Transition Plan nonwhite class

---

[14] The Special Master's objections to the Union's Transition Application appear animated in no small part by the "bad days."  The Special Master describes the parties' defense of the Transition Plan as "strikingly comparable to those the parties advanced to support their 2002 and 2005 proposed joint consent orders – both of which the Court soundly rejected for reasons similar to the ones articulated in my Opposition Report."  (SM Supp. at 3; *see also* SM Report at 6-7 (describing events of 2005).)

members and the post-Transition nonwhite class members." (SM Response To Questions at 3.)  The post-Transition class members would, according to the Special Master, be deprived of the same benefits and protections received by pre-Transition class members because counseling services will be controlled by the Union rather than by an independent source.

49.    Under that logic, the Union could never successfully apply for Transition. Moreover, the argument glosses over the fact that the Union plans to retain a national health behavioral services company and an independent counselor to deliver services and presumes that the services provided by the Union will not be commensurate with those provided by the Special Master.  (Tr. at 5.)  There is no basis to pre-emptively draw that conclusion, however, particularly as the Union has demonstrated that it is capable of adequately providing the services.[15]

## Conclusion

50.    The Union's Transition Application to begin the trial period of transitioning the MAP/ETER Services, including the Referral Hall, pursuant to the Structural Changes Order is APPROVED.  The Union shall adhere to the requirements of the SCO and other orders in carrying out the Transition.  Additionally, the Union shall solicit and consider in good faith any recommendations that the Special Master provides in connection with carrying out the Transition.  If the Union cannot adequately provide the transitioned services, any party or the Special Master may apply to the Court to cease, reverse or modify the Transition.

---

[15] To the extent not discussed above, the Court has considered all other arguments asserted by the Special Master and finds that they do not warrant denying the Union's Transition Application.

SO ORDERED.

_____

ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated:      October 22, 2019
            New York, New York

Copies transmitted via ECF to all counsel of record
and the Special Master.