UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

                                    Plaintiff,

                                                                    71-cv-2877 (LAK)

                -against-

INTERNATIONAL ASSOCIATION OF BRIDGE
STRUCTURAL AND ORNAMENTAL
IRONWORKERS LOCAL 580, et al.,

                                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OPINION**


            Appearances:


                            Kimberly A. Cruz
                            Jeffrey C. Burstein
                            Justin Mulaire
                            U.S. EQUAL EMPLOYMENT OPPORTUNITY
                            COMMISSION
                            *Attorneys for Plaintiff EEOC*


                            Christopher P. O'Hara
                            COLLERAN O'HARA & MILLS, LLP
                            *Attorney for Defendants Local 580 and the AJEF*


                            Steven N. Davi
                            LAW OFFICE OF STEVEN N. DAVI, PLLC
                            *Attorney for Defendant Allied Building Metal
                            Industries, Inc.*


                            David Raff
                            RAFF & BECKER, LLP
                            *Special Master*

2

LEWIS A. KAPLAN, *District Judge.*

Fifty-three years ago, the United States brought this action against defendants Local 580 of the International Association of Bridge, Structural, and Ornamental Ironworkers ("Local 580"), the Joint Apprentice-Journeymen Educational Fund of the Architectural Ornamental Iron Workers Local 580 ("AJEF"), and Allied Building Metal Industries ("Allied"), among others, for racial discrimination in their employment practices in violation of Title VII of the 1964 Civil Rights Act ("Title VII").   In 1974, the U.S. Equal Employment Opportunity Commission ("EEOC") was substituted for the United States as plaintiff (defendants and the EEOC together referred to as the "Parties").

Over the intervening years, the Court has issued multiple judgments and orders endeavoring to bring Local 580 and its co-defendants into compliance with Title VII.  Now before the Court is the Parties' second joint motion to approve a new Proposed Consent Decree,[1] which in effect would acknowledge that the goals of the Court's orders largely have been accomplished and would commence a three-year process that would eliminate many current protective obligations immediately, limit enforcement mechanisms over that period (including supervision by the Special Master), and thereafter terminate judicial oversight of defendants.[2]  For the reasons set forth below, the Parties' motion is denied.

---

[1]      Dkt 505 (Second Joint Mot.).

[2]      Dkt 505-1 (Consent Decree) at 2, ¶¶ 34, 37-41; Dkt 431 (First Mem.) at 8, 11-12.

### *Facts and Procedural History*[3]

In 1978, seven years after the United States first brought suit, the Parties entered into — and the Court approved — a Consent Judgment that resolved the government's claims. Among other things, the 1978 Consent Judgment permanently enjoined defendants from discriminating on the basis of race and other protected criteria, created benchmark goals for minority membership in Local 580, and regulated the union's admissions, referral, and recordkeeping practices.[4]

In 1987 and 1988, the Court held Local 580 and the AJEF in contempt for failing to comply with the provisions of the 1978 Consent Judgment.[5] To ensure their compliance with the original judgment, the Court issued two remedial orders which reissued the existing injunctions against defendants and imposed additional constraints on them, including prescribing new rules for job training and referrals, requiring the development of a new "information tracking system," and increasing defendants' recordkeeping requirements.[6] In addition, the Court appointed Special Master David Raff pursuant to Federal Rule of Civil Procedure 53 to oversee and enforce compliance with the provisions of its orders.[7] In 1991, the Court entered a third remedial order in another attempt to

---

[3] The Court assumes familiarity with the underlying facts and the procedural history and thus provides the minimal background necessary to decide the motion.

[4] Dkt 432-2 ("1978 Cons. Judg.") §§ II-IV.

[5] *See E.E.O.C. v. Loc. 580, Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers*, 669 F. Supp. 606, 625 (S.D.N.Y. 1987), *E.E.O.C. v. Loc. 580, Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers*, No. 71-cv-2877, 1988 WL 131293, at *9 (S.D.N.Y. Dec. 1, 1988), *both decisions aff'd sub nom*. 925 F.2d 588 (2d Cir. 1991).

[6] *See generally* Dkt 432-4 ("1988 Apprentice Order"); Dkt 432-5 ("1989 Journeyman Order").

[7] *See Loc. 580*, 669 F. Supp. at 624-25; *Loc. 580*, 1988 WL 131293, at *9.

4

ameliorate the disparity in working hours, revising Local 580's job referral system and requiring its contractors to make at least 65 percent of their hires through that system (the "65/35 Rule").[8] Finally, in 2011 the Court issued its most recent contempt order against the union for its failure to adhere to the court-ordered referral system.[9]

On November 19, 2020, professing a belief that "circumstances ha[d] changed dramatically since the entry of the original Consent Judgment in 1978,"[10] the Parties filed a joint motion with the Court for approval of a new Proposed Consent Decree.[11]  Among other things, the new decree would have immediately overridden the Court's existing orders, reduced government oversight of the Parties, and "expire[d] by its own terms" after only three years.[12]  In addition, it would have reduced defendants' recordkeeping and reporting requirements and ended the decades-long appointment of the Special Master, replacing him with an EEO/Compliance Officer who could receive, investigate, and address employment discrimination complaints during the proposed three remaining years of government supervision.[13]  The Proposed Consent Decree explicitly stated that "[t]he EEOC is satisfied" with defendants' "ongoing commitment . . . to Black and Hispanic

---

[8]     Dkt 435-12 ("1991 Referral Order") at 6-8.

[9]     *E.E.O.C. v. Int'l Ass'n of Bridge Structural & Ornamental Ironworkers Loc. 580*, No. 71-cv-2877, 2011 WL 1236592, at *1 (S.D.N.Y. Mar. 29, 2011).

[10]    Dkt 431 (First Mem.) at 5.

[11]    Dkt 430 (First Joint Mot.) at 3.

[12]    Dkt 505-1 (Consent Decree) ¶¶ 34, 37-41.

[13]    *Id*. ¶¶ 18-21, 26-29, 37-40.

workers" and declared that "it is fair, reasonable, and in the public interest to modify and eventually to conclude oversight of the Defendants by the Government and by the Court."[14]

The Special Master opposed the Parties' motion, arguing primarily that the disparity in work hours between minority and non-minority union members — as well as Local 580's deficient recordkeeping practices — made it improper to remove the Court's existing orders and sunset Court and government supervision.[15]  On December 15, 2021, the Court requested additional information from the EEOC to better evaluate the Proposed Consent Decree.[16]  Specifically, the Court sought information regarding (1) the EEOC's outreach to Black and Hispanic union members, (2) current employment opportunities for those members, and (3) the Parties' efforts to achieve proportionate working hours.[17]

On February 14, 2022, the EEOC filed a supplemental memorandum and exhibits in support of the Proposed Consent Decree, including EEOC forms soliciting information on racial discrimination from union members, a report by Dr. Erich Cromwell concerning racial disparities in hiring and hours, and a declaration by Local 580's business manager Peter Myers regarding the union's efforts to achieve proportionate working hours.[18]  The Court was satisfied with defendants' outreach to Black and Hispanic members, but otherwise concluded that the EEOC's submissions did

---

[14]

  *Id.* at 2.

[15]

  *See generally* Dkt 435 (First R&R).

[16]

  Dkt 462 at 2-3.

[17]

  *Id.*

[18]

  *See* Dkts 470-71.

not address adequately the Court's requests for additional information on members' employment opportunities and efforts by defendants to achieve equal hours.[19]  Specifically, the Court characterized the EEOC's submissions as "entirely fail[ing] to respond to the Court's request" for the data underlying its conclusion that there was no evidence of discrimination by Local 580, and it criticized the Myers report as "insufficient and conclusory" rather than providing the requested "detailed accounting" of Local 580's actions.[20]  As a result, the Court denied the Parties' first joint motion to approve the Proposed Consent Decree "without prejudice to renewal on the existing papers together with the further submissions required."[21]

In June 2023, the Parties' filed their second joint motion for approval of the Proposed Consent Decree.[22]  In support of the renewed motion, they submitted updated versions of the Cromwell report and the Myers declaration.[23]  The Special Master again opposed the motion, contending principally that the Parties had failed to provide the information requested by the Court and renewing his arguments that the hours disparity and deficient recordkeeping practices made it improper to enter into the new decree.[24]  The matter is now before the Court for decision.

---

[19]    Dkt 474 at 2.

[20]    *Id*.

[21]    *Id*.

[22]    Dkt 505 (Second Joint Mot.).

[23]    *See* Dkt 506-2 (Cromwell Rep.); Dkt 506-3 (Myers Dec.).

[24]    *See generally* Dkt 521 (Second R&R).

### *Legal Standard*

Congress enacted Title VII of the Civil Rights Act of 1964 "to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees."[25]  "The purpose and procedures of Title VII indicate that Congress intended federal courts to exercise final responsibility for enforcement of Title VII."[26] Accordingly, "[w]here racial discrimination is concerned, 'the [district] court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future.'"[27]

When reviewing a proposed consent decree involving a government enforcement agency, the Court must determine at a minimum that the decree is "fair and reasonable" before granting its approval.[28]  A fair and reasonable consent decree is basically legal, clear, reflects a resolution of the actual claims in the complaint, and is not tainted by improper collusion or corruption.[29]  In addition, for a proposed consent decree that includes injunctive relief, the Court must impose "the additional requirement that the 'public interest would not be disserved.'"[30]

---

[25]

*Griggs v. Duke Power Co.*, 401 U.S. 424, 429-30 (1971).

[26]

*Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 56 (1974).

[27]

*Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975) (quoting *Louisiana v. United States*, 380 U.S. 145, 154 (1965)).

[28]

*S.E.C. v. Citigroup Glob. Mkts. Inc*., 752 F.3d 285, 294 (2d Cir. 2014).

[29]

*Id*. at 294-95 (quoting *eBay, Inc. v. MercExchange*, 547 U.S. 388, 391 (2006)).

[30]

*Id*. at 294.

8

It is an open question whether a district court can review a proposed consent decree in the Title VII context for its adequacy.  In *S.E.C. v. Citigroup*, the Second Circuit held that "the proper standard for reviewing a proposed consent judgment involving an enforcement agency" did not permit review of its "adequacy", a factor that had been borrowed from class action doctrine.[31] At least one court in this circuit, however, has raised questions regarding whether the rule in *Citigroup* applies to the EEOC in Title VII cases.  In *United Sates v. City of New York* — a Title VII class action — the court summarized in *dicta* the historical inclusion of an "adequacy" test in Title VII suits, while recognizing that *Citigroup* had cast doubt about its continued use:

> "[C]ourts have held that the proper standard for approval of a consent decree resolving a Title VII pattern or practice action assesses whether the proposed agreement is lawful, fair, reasonable, *adequate*, consistent with the public interest, and not the product of collusion [citing cases] . . . .  The court may need to place greater importance on the adequacy of the proposed settlement here, in the Rule 23 context, than would be appropriate were it considering a consent decree in a Title VII action brought solely by the United States. [Citing *Citigroup*]."[32]

To "omit 'adequacy' from the standard" for review of "proposed consent decree[s]"[33] in the Title VII context would seem to the Court to undermine the original intent of Congress in passing the Act.[34]  Nonetheless, the Court need not decide this question in order to resolve this

---

[31]

      *Id*. (citing Fed. R. Civ. P. 23(e)).

[32]

      *United States v. City of New York*, 308 F.R.D. 53, 62-63 (E.D.N.Y. 2015) (emphasis added).

[33]

      *Citigroup Glob. Mkts.*, 752 F.3d at 294.

[34]

      *See, e.g.*, *Albemarle Paper*, 422 U.S. at 418 ("Where racial discrimination is concerned, the district court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future" (cleaned up)).

motion.  Even under the lesser standard articulated in *Citigroup*, the district court's role "is not merely [to] 'rubber stamp'" consent decrees negotiated by government agencies.[35]  The Court cannot "simply accept a proposed . . . consent decree without any review," as failure to conduct a review constitutes "a dereliction of the court's duty to ensure the orders it enters are proper."[36]  Accordingly, the Court's opinion proceeds under the *Citigroup* standard of review.  Using this analytical framework, the Court concludes that the Parties have not established the fairness and reasonableness of the Proposed Consent Decree.  Nor have they shown that terminating the existing fair employment protections would not disserve the public interest.

### *Discussion*

As outlined above, the Court highlighted two continuing deficiencies in the Parties' submissions when denying without prejudice their first joint motion to approve the Proposed Consent Decree: (1) their failure to provide the data underlying employment opportunities for Black and Hispanic union members, and (2) the lack of a "detailed accounting of the Parties' efforts to achieve proportionate working hours."[37]  Now in their present attempt, the Parties again fail to provide the information requested of them and required by the Court's orders.  This time, however, the Court is convinced that the data and information in question do not exist.

---

[35]    *S.E.C. v. Levine*, 881 F.2d 1165, 1181 (2d Cir. 1989).

[36]    *Citigroup Glob. Mkts.*, 752 F.3d at 298.

[37]    Dkt 474 at 2 (citing Dkt 462 at 2-3).

1.    *Data on Employment Opportunities for Black and Hispanic Members*

The Court orders and judgments governing defendants' conduct now and in the past affirmatively require them to track and collect certain data in order to "establish a precise record of the hiring experience and hours worked of Local 580 members by race" and to ensure that they are providing Black and Hispanic members with equal employment opportunities.[38] "If the union cannot or will not provide the information it is required to maintain, the union should not be permitted to benefit."[39]

Among the various data collection requirements governing the Parties, Local 580 is obligated to devise and maintain a recordkeeping system for its referral hall (also called a "hiring hall"), which aids in referring and matching union members with job requests. For example, the 1978 Consent Judgment requires that "[a]ll applicants for referral to jobs under the jurisdiction of Local 580 shall be recorded" and "retained as a permanent record in the referral hall, available to any applicant, upon request. . . ."[40] It compels Local 580 also to maintain referral sheets and requests from contractors,[41] and requires that the union collect such data as "the dates when [members] were hired, the manner in which they were hired, . . . the job for which they were hired and the work

---

[38]

    *Loc. 580*, 1988 WL 131293, at *8.

[39]

    *E.E.O.C. v. Loc. 580, Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers*, No. 71-cv-2877, 1985 WL 1510, at *3 (S.D.N.Y. May 31, 1985).

[40]

    1978 Cons. Judg. § IV.2.

[41]

    *Id*. §§ IV.8-9.

actually performed, *and by date the hours worked including overtime*."[42]  The 1989 Journeyman

Order extends these "recordkeeping and reporting requirements" to "[a]ll contractors who hire

journeymen . . . or to whom Local 580 refers journeymen,"[43] and additionally compels the union to

report its collected data to the Special Master and EEOC "on a monthly basis."[44]  Finally, the Court's

1991 Referral Order specifies how the Parties are to operate the modernized referral system and

record the necessary information for adequate monitoring.[45]

  In the Parties' expert report, Dr. Erich Cromwell analyzed Local 580's referral hall

data and concluded, based on what was available to him, that there was no discrimination in

treatment between minority and non-minority members.[46]  However, while purporting to analyze data

from 2009-2019 in his report,[47] Dr. Cromwell admitted — without any apparent dispute — that the

Parties' "hiring hall dispatch dataset only contain[ed] data from June 19, 2018 and therefore limit[ed]

analysis to [after] this time period."[48]  In effect, all relevant referral hall data from prior to June 19,

---

[42]

  *Id*. § IV.19 (emphasis added).

[43]

  1989 Journeyman Order § IX.D.

[44]

  *Id*. § IX.B.1.

[45]

  1991 Referral Order at 4-6.

[46]

  Dkt 506-2 (Cromwell Rep.) at 24-28.

[47]

  *See id*. at 3, 24, 28, 40; Dkt 471 at 2 ("The EEOC asked its in-house analytical services unit to conduct a statistical analysis of Local 580 employment data from the preceding decade (2009 - 2018)"); Dkt 431 (First Mem.) at 6.

[48]

  Dkt 506-2 (Cromwell Rep.) at 24; *see also* Dkt 507 (Mem. of Law) at 8i.

2018 either is missing or unusable — the Parties do not specify which.  To make matters worse, Dr. Cromwell attempted to utilize data from a different source to make up for the paucity of union records, yet concluded that even this data contained "critical limitations" and thus could not provide "any meaningful value" to his report.[49]  Specifically, the "data from the prior Braveline system" did not "contain a complete record of all unemployed journeypeople available for referral," failed to "capture how long [a] journeyperson had been unemployed," and could not reliably verify whether a "dispatched journeyperson was or was not in accordance with Local 580's guidelines"[50] — all of which fell squarely within the union's recordkeeping requirements under the Court's prior orders.

Equally concerning is the *complete* absence of any data on the "65/35 Rule," implemented by the 1991 Referral Order to require contractors to make at least 65 percent of their hires through Local 580's referral system.[51]  While the rule quite clearly aimed to ameliorate the racial disparity in working hours by exercising some control over contractor hires, Dr. Cromwell concluded that it was "impossible to determine . . . whether 65% of [journeypeople] were filled through the referral hall" because there was "no reliable data" on the matter.[52]  In fact, even the Parties acknowledge that the lack of data on the rule "is a real concern," as it "interfere[s] with the ability to monitor compliance with the court orders in this case."[53]

---

[49]     Dkt 506-2 (Cromwell Rep.) at 28.

[50]     *Id.*

[51]     1991 Referral Order at 6-8.

[52]     Dkt 506-2 (Cromwell Rep.) at 24 n.18.

[53]     Dkt 507 (Mem. of Law) at 17i-18i.

The Court agrees that the years of missing data pose "a real concern" to the resolution of this case. First, despite Dr. Cromwell's conclusion that limited referral data from June 2018 through 2019 shows no "significant difference in treatment between non-minority journeypeople and Black and Hispanic journeypeople,"[54] the Court has no basis or reason for extrapolating such a conclusion beyond the narrow time period for which there is any data. Indeed, even Dr. Cromwell acknowledges that the missing data "limits analysis to [the specified] time period."[55] Despite the Parties' pleas to the contrary,[56] one year of partial data is not sufficient to justify a conclusion that defendants and contractors no longer discriminate against Black and Hispanic union members and now are committed to providing them with equal employment opportunities. Indeed, this is particularly true given the long and well-documented history of discrimination by defendants,[57] as well as the existence of current evidence suggesting that Black and Hispanic workers *still* are not receiving the same hours of work as other union members. Local 580 *may* not have discriminated against Black and Hispanic members in its referrals from June 2018 through 2019,[58] but the Parties' efforts to extrapolate beyond that narrow time frame and to argue that they are in broad compliance with the Court's orders is pure speculation.

---

[54] Dkt 506-2 (Cromwell Rep.) at 5-6.

[55] *Id*. at 24.

[56] Dkt 507 (Mem. of Law) at 17i.

[57] Recall that this case is now 53 years old and still producing new evidence of discrimination.

[58] Even this severely limited statement is uncertain, given that other data that could have shown non-discrimination in referrals from 2018-2019 is inexplicably missing.

Second, the fact that the Parties have not provided, and cannot provide, data necessary to support their position undermines the grounds for filing a second joint motion and asking the Court to reconsider the Proposed Consent Decree. In its most recent order, the Court did not request additional information from the Parties — rather, it denied the previous motion, allowing for renewal only if "the EEOC . . . provide[d] the data underlying its pre-settlement analysis" (among other things).[59] Yet as already has been explained, the EEOC cannot do so for the most critical data missing from its previous submission, a fact that the Parties and their expert readily admit.[60] Accordingly, the Parties present insufficient grounds for reopening the motion, as they have not provided the key requirement (underlying data) necessary for the Court to reconsider its prior order.

Third, the Court is not persuaded by the Parties' attempts to shift responsibility for the missing data to the contractors and the Special Master.[61] Local 580 is required to obtain necessary data from its contractors to comply with the Court's orders.[62] If contractor reports fail to "contain all the information the union [is] obligated to obtain and keep, then it [is] the union's obligation to get that missing information."[63] Moreover, the Special Master's broad supervisory authority over Local 580 is a complementary — rather than superseding — power, and thus does not relieve the union of its recordkeeping and data collection requirements. "Local 580 has only itself

---

[59]    Dkt 474 at 2.

[60]    *See* Dkt 506-2 (Cromwell Rep.) at 24; Dkt 507 (Mem. of Law) at 8i.

[61]    *See* Dkt 507 (Mem. of Law) at 17i-18i, Dkt 529-1 at 2.

[62]    *See, e.g.*, 1989 Journeyman Order § IX.D.

[63]    *Loc. 580*, 1985 WL 1510, at *2.

to blame if its long-standing refusal to comply with the record keeping and reporting obligations of the consent judgment prejudice its ability to defend against . . . claim[s] of non-compliance in the provision of equal employment opportunities."[64]

Finally, and perhaps most importantly, defendants' failure to keep basic records and collect data that they are under Court orders to maintain weighs heavily against entering the Proposed Consent Decree and absolving them of their current obligations. There is no dispute that the various recordkeeping requirements are "essential elements" of the Court's orders "and must be complied with strictly."[65] In that sense, they are independent of the Parties' other commitments to prevent discrimination and are important for their own sake, namely to demonstrate that Local 580 takes its obligations seriously, has complete knowledge of its hiring practices and their effects, and can provide the Court with the data necessary to ensure compliance with its orders.

The fact that defendants have not complied with the most basic recordkeeping requirements proves that it would be neither fair nor reasonable for the Court to enter a new consent decree leading to terminating the defendants' obligations. The missing data and records are critical to determining whether Local 580 can be trusted to treat its Black and Hispanic members fairly without court supervision. Local 580's apparently persistent indifference to its court-mandated recordkeeping requirements demonstrates that it cannot be trusted to protect its minority workers, and the Court will not reward it for such blatant disregard of its obligations.[66] Entry of the Proposed

---

[64]

Loc. 580, 1988 WL 131293, at *8.

[65]

1989 Journeyman Order § IX.A.

[66]

Indeed, in the Parties' reply brief, they admitted that even *after* implementing 2018 overhaul of their referral hall data system, they *still* did not record the data necessary to ensure

16

Consent Decree thus would fail to resolve the core claims of the complaint in this matter.

### 2.    *Accounting of Parties' Actions to Achieve Proportionate Hours*

In addition to data on employment opportunities, the Parties continue to dispute whether the Court's orders place an "affirmative obligation on Local 580 to address hours disparities" between its minority and non-minority members.[67]  Yet despite defendants' best attempts to shirk this responsibility, the Court already has rejected their interpretation of the court-mandated obligations under which they operate.  Citing to the 1978 and 1989 orders, the Court previously stated explicitly in its request for additional information that "Defendants remain under an affirmative obligation . . . *to work proactively* to ensure proportionate employment opportunities for Black and Hispanic members."[68]  And the Court reiterated this position in its order denying the Parties' first joint motion, instructing again that they were required to "set out the actions Local 580 has taken to address the fact that white members work more hours than Black and Hispanic members, and explain why Defendants have yet succeeded in mitigating the shortfall."[69]

The Court's interpretation of defendants' obligations is grounded in the text of its orders.  Most prominently, the 1978 Consent Judgment obliges the Parties periodically to "review the procedure for hiring at the shop or job site . . . to ascertain whether the[ir] practices have had the

---

compliance with the 65/35 Rule.  *See* Dkt 529 (Reply Mem.) at 15 n.7.

[67]    *Id*. at 9.

[68]    Dkt 462 at 2 n.2 (emphasis added).

[69]    Dkt 474 at 2.

effect of discriminating against any non-whites within the jurisdiction of Local 580.  If there has been a disparate discriminatory effect on such non-whites, *the parties shall endeavor to remedy such effect*."[70]  The order repeatedly requires that Local 580 and those working in concert with it take affirmative action "to eliminate the effects of any alleged past discriminatory policies and practices with respect to employment of non-whites," using unqualified language to communicate that the defendants must be proactive participants in the program.[71]  And for good measure, the order eliminates any confusion that equitable working hours is not one of the "effects" of discrimination that it targets, explaining that "[t]he goal of this program and of this judgment generally is to assure that . . . non-white members of Local 580, as well as those non-whites utilizing Local 580's Referral Hall, will share equitably in all employment opportunities *and other conditions and privileges of employment* afforded to all members."[72]  There can be little question that the number of work hours assigned to an employee — and thus the daily wage that they may earn as a result — is one of the most defining "conditions and privileges" of any worker's employment.

The Court's 1989 Journeyman Order similarly imposes affirmative obligations on defendants to remedy any discriminatory effects.  The key provision of the order instructs that "Local

---

[70]

1978 Cons. Judg. § IV.20 (emphasis added).

[71]

*See, e.g.*, *id*. § II.4 ("Defendants, including Allied and its members shall conduct the operation of their affairs so as to insure that they engage in no act or practice which has the purpose or effect of excluding any individual members . . . from equal work opportunities, including equal treatment in the authorization of overtime, in conditions and privileges of employment, and in all other respects"); *id*. § III.A.1 ("Local 580 shall take the following steps in order to . . . eliminate any alleged discriminatory conduct"); *id*. § IV.20 ("[T]he parties shall endeavor to remedy such [discriminatory] effect.").

[72]

*Id*. § III.A.1 (emphasis added).

580 *shall take all steps necessary* to insure that black and Hispanic journeymen receive their proportionate share of employment opportunities."[73]  The Parties' primary contention revolves around the phrase "employment opportunities," arguing that it requires only non-discrimination in job referrals and hiring opportunities, rather than in working hours.[74]  Yet the number of hours that a union member is given the opportunity to work — as well as the hours contract on which he or she is hired — falls squarely within the plain meaning of "employment opportunities" under any standard definition.  Other provisions in the Court's orders, moreover, make clear that work hours are encompassed within the meaning of the phrase, prohibiting defendants from "excluding any individual members . . . from equal work opportunities, *including* equal treatment in the authorization of overtime, in conditions and privileges of employment, and in all other respects."[75]

The Court's interpretations align also with past rulings that construed similar provisions of similar orders as placing affirmative obligations on discriminating defendants.  In a

---

[73]    1989 Journeyman Order § VII.A (emphasis added).

[74]    Dkt 507 (Mem. of Law) at 20i-22i; Dkt 529 (Reply Mem.) at 11-12.

[75]    1978 Cons. Judg. § II.4 (emphasis added); *see also id.* § II.2 ("Local 580, its officers, agents, employees, members or other persons engaged in the administration of the affairs of Local 580 as well as their successors, and all persons in active concert or participation with any of them . . . shall [not] take any other action which would deprive or have the effect of depriving any individual of *employment opportunities with any employer in obtaining compensation, in working conditions or privileges or in advancement* or otherwise adversely affect his status with Local 580") (emphasis added).

The Parties and Special Master dispute whether the two provisions cited above also place affirmative obligations on defendants to ameliorate working hour disparities, with the Parties characterizing them as only "negative injunctions" that prohibit rather than require action and the Special Master countering that the provisions apply to Local 580's contractors as well, whose actions they are required to police.  *See* Dkt 529 (Reply Mem.) at 9-11; Dkt 521 (Second R&R) at 13-17.  Again, the Court agrees with the Special Master's interpretation.

related case filed under the same docket number as the present matter, the Second Circuit admonished a different union for similarly ignoring its own court-mandated obligations:

> "The [order] requires the Union to 'administer all of the affairs of Local 28 ... so as to ensure that no individual is excluded from equal work opportunities, including but not limited to overtime and advancement, on the basis of race, color or national origin.' *The evidence was overwhelming that nonwhite journeypersons were working significantly fewer hours than their white counterparts*, yet Local 28 took no steps to alleviate the problem (indeed, the district court found that its business agents were actively exacerbating the problem). Under the [order], Local 28 was *required to take those steps that were within its power to eliminate this disparity*."[76]

While the Parties are correct that the language of the order and its circumstances are not *exactly* the same as in this case, no rigorous analysis is needed to apply the same basic interpretation that ensuring "equal work opportunities" requires active effort to eliminate hours disparity. Indeed, the Court's companion cases repeatedly have acknowledged as much.[77]

Against this backdrop, it would not be fair or reasonable to adopt the Parties' Proposed Consent Decree. For starters, the Court should not even be considering the Parties' second joint motion, again because they have failed utterly to provide the information that was required of them to reopen the matter. In the order denying the Parties' first motion, the Court allowed for its renewal only if it included "a 'detailed accounting' of the Parties' efforts to achieve proportionate working hours."[78] Yet the updated Myers declaration filed by the Parties provides even *less* information on their actions to ameliorate the hours disparity than their previous submissions,

---

[76]

*E.E.O.C. v. Loc. 638, Loc. 28 of Sheet Metal Workers' Int'l Ass'n*, 81 F.3d 1162, 1175 (2d Cir. 1996) (emphasis added).

[77]

*See* Dkt 521 (Second R&R) at 26-28 (collecting cases).

[78]

Dkt 474 at 2.

20

focusing almost exclusively on the Special Master's costs and the merits of the Proposed Consent Decree rather than on their instructed task.[79]  As they did for the missing employment opportunity data, the Parties ignored the Court's explicit conditions for filing a renewal motion, choosing instead to introduce new substantive arguments and relitigate battles that they already had lost.  The Parties' second joint motion thus can be denied on this ground alone.

Even considering the merits of the Proposed Consent Decree, the Court finds that it would not be fair or reasonable to enter into a new order which reduces the obligations imposed upon defendants to eliminate racial discrimination.  The statistical proof of racial disparities among union members in hours worked is undeniable, as Dr. Cromwell's report established.  So too is there no proof of action by defendants to ameliorate those disparities.  And defendants thus far have not shown that they are inclined to do so.  As a result, *reducing* the supervision and obligations imposed upon them would be highly unlikely to actually improve racial disparities among union workers — the entire purpose of this litigation.[80]  If defendants are unable or unwilling to eliminate discrimination under more stringent provisions, there is little chance that they will accomplish such goals under lesser ones.

In any event, defendants' disregard for their court-ordered obligations by failing to take required action further confirms the Court's conclusion that they should not be trusted to protect Black and Hispanic workers on their own accord.  The Court will not reward defendants for their apparent indifference to minority workers and to the law by entering into a less stringent regime with

---

[79]     *Compare* Dkt 506-3 (Second Myers Dec.) *with* Dkt 471-4 (First Myers Dec.).

[80]     *See Citigroup Glob. Mkts.*, 752 F.3d at 294-95 (courts should consider whether a proposed consent decree "reflects a resolution of the actual claims in the complaint").

the aim of winding down any and all supervision in only three years.

3.      *The Proposed Consent Decree Would Harm the Public Interest*

        While the foregoing analysis demonstrates why approval of the Proposed Consent Decree would not be "fair and reasonable," the Court is cognizant also of the fact that its entry would harm the public interest, an independently sufficient basis for its rejection.  Defendants repeatedly have demonstrated to the Court that they are unwilling to take action necessary to eradicate racial disparities among their members and to adhere to basic court-mandated obligations, even after more than fifty years of contempt findings, complaints, and judicial admonishments.  To approve a consent decree that would eliminate many current protective obligations, reduce government oversight, and fully terminate after only three years implicitly would condone defendants' actions and would communicate to their Black and Hispanic workers that protection of their rights under the law is secondary to judicial convenience and efficiency.  Moreover, entry of the Proposed Consent Decree would indicate to the public and to similarly-situated defendants that disregard of court orders and indifference to the law are appropriate and successful strategies which can bear fruit if defendants simply are willing to outlast the Court's efforts.

        In addition, the Proposed Consent Decree would reduce and eventually terminate the recordkeeping and reporting requirements governing the defendants, who historically have not complied with those already imposed upon them.  Defendants' Black and Hispanic members already are known to suffer from disparate treatment and work opportunities, yet the full extent of these racial disparities is not known *because of* defendants' obstinate failure to collect and record the court-mandated data required of them.  Thus, entry of a Proposed Consent Decree that would further

reduce the recordkeeping obligations of known violators not only would reward their recent actions, but would make it even *more* difficult in the future to ensure that defendants' Black and Hispanic members were receiving equal employment opportunities and treatment. Such a decree would actively harm the public interest in monitoring and eliminating discrimination and in enforcing compliance with judicial orders.

The Parties counter that the high costs of the Special Master in part justify entry of the new decree, as it would serve the public interest to free up those funds for other use.[81] Yet such contentions attempt to redirect blame for the Special Master's expense onto the Special Master himself rather than on the Parties, whose continued failure to comply with the Court's orders is what provides the need to employ such a position.[82] In addition, the Parties highlight the EEOC's unique role as an agency tasked with "representing the public interest" as a reason for according "significant weight" to its judgment regarding the Proposed Consent Decree.[83] Yet this, too, is nothing more than an attempt to substitute position for logic. While it is true that the EEOC was created in part "to vindicate the public interest in preventing employment discrimination,"[84] the agency over the years

---

[81]

Dkt 507 (Mem. of Law) at 5i-7i, 16i.

[82]

*See, e.g.*, *E.E.O.C. v. Loc. 638, Loc. 28 of Sheet Metal Workers' Int'l Ass'n*, 889 F. Supp. 642, 667 (S.D.N.Y. 1995) ("Like the contempt fines that the union pays . . . the Administrator's compensation serves as a testament to the union's refusal to comply with both the law and this court's orders, rather than as evidence of good faith efforts by the union.").

[83]

Dkt 507 (Mem. of Law) at 13i.

[84]

*Gen. Tel. Co. of the Nw. v. E.E.O.C.*, 446 U.S. 318, 326 (1980).

perhaps "ha[s] not always been [a] zealous representative[] of . . . victims of discrimination."[85]  The Court is required to make its own independent determination of the public interest, rather than defer outright to an executive agency whose judgments may vary from administration to administration.

The Court recognizes that the *status quo* has not eliminated all badges and incidents of discrimination for union members, as the disparity in working hours most clearly illustrates. However, the Parties helpfully describe the progress made thus far under the current slate of Court orders, including success in achieving minority membership and recruitment goals, significant Black and Hispanic representation among leadership, and virtually no anecdotal reports of overt hostility or discrimination.[86]  This demonstrates that the existing orders can produce the desired results if adequately pursued.  Renewed diligence in enforcement of those orders is more likely to force defendants to eradicate *all* forms of discrimination from their referral and employment practices, and thus will serve the public better than the provisions of the Proposed Consent Decree.  Accordingly, the Court concludes that entry of the Proposed Consent Decree — which would decrease oversight and reduce the obligations imposed upon defendants known to be in violation of Court orders and demonstrably unwilling to eradicate racial disparities — would disserve the public interest.

---

[85]
       *E.E.O.C. v. Loc. 638, Loc. 28 of Sheet Metal Workers' Int'l Ass'n*, No. 71-cv-2877, 2003 WL 21804837, at *1 n.4 (S.D.N.Y. Aug. 6, 2003).

[86]
       Dkt 507 (Mem. of Law) at 13i-15i.

24

### *Conclusion*

The Court recognizes that defendants in this case have labored under various forms of judicial supervision for nearly fifty years now. Perpetual court oversight is to be disfavored — indeed, "even a 'permanent' injunction 'is justified only by the wrongdoing that induced it and only so long as it counteracts a continuing violation.'"[87]

The case at hand, however, presents a situation where, despite repeated claims that the need for judicial oversight is gone, the Parties have admitted to continued and persistent racial disparities. Moreover, the data that theoretically might justify a relaxation or termination of supervision does not exist, notwithstanding express obligations from the Court to collect it. Accordingly, the Parties have failed to show that the racial discrimination which first gave rise to the need for court oversight has been eliminated and that the Court therefore should enter their Proposed Consent Decree.

For the foregoing reasons, the Parties' second joint motion for approval of the Proposed Consent Decree (Dkt 505) is DENIED.

SO ORDERED.

Dated:        November 6, 2024

_____
Lewis A. Kaplan
United States District Judge

---

[87] *Chance v. Bd. of Examiners*, 561 F.2d 1079, 1092 n.25 (2d Cir. 1977) (cleaned up) (quoting *Milk Wagon Drivers Union of Chi., Loc. 753 v. Meadowmoor Dairies*, 312 U.S. 287, 298 (1941)); *see also Garcetti v. Ceballos*, 547 U.S. 410, 411 (2006).